

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-29-1999

# Unity Real Estate Co v. Hudson

Precedential or Non-Precedential:

Docket 97-3234,97-3236

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Unity Real Estate Co v. Hudson" (1999). *1999 Decisions.* Paper 80.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/80

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 1 of 2

Filed March 29, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 97-3234 and 97-3236

UNITY REAL ESTATE COMPANY,
        Appellant No. 97-3234

v.

MARTY D. HUDSON; MICHAEL H. HOLLAND; THOMAS
O. S. RAND; ELLIOTT A. SEGAL; CARLTON R. SICKLES;
GAIL R. WILENSKY; WILLIAM P. HOPGOOD; TRUSTEES
OF THE UNITED MINE WORKERS OF AMERICA
COMBINED BENEFIT FUND; THOMAS F. CONNORS;
ROBERTS WALLACE; TRUSTEES OF THE 1992 UNITED
MINE WORKERS OF AMERICA BENEFIT PLAN; UNITED
STATES OF AMERICA (Intervenor in District Court)

        LTV Corporation (LTV), NACCO Industries,
        Inc. (NACCO); Amicus Curiae

BARNES AND TUCKER COMPANY,
        Appellant No. 97-3236

v.

MARTY D. HUDSON, Trustee of the United Mine Workers
of America Combined Benefit Fund and Trustee of the
1992 United Mine Workers of America Benefit Plan;
MICHAEL H. HOLLAND, Trustee of the United Mine
Workers of America Combined Benefit Fund and Trustee
of the 1992 United Mine Workers of America Benefit Plan;
THOMAS O. S. RAND, Trustee of the United Mine
Workers of America Combined Benefit Fund; ELLIOTT A.
SEGAL, Trustee of the United Mine Workers of America
Combined Benefit Fund; CARLTON R. SICKLES, Trustee
of the United Mine Workers of America Combined Benefit

Fund; GAIL R. WILENSKY, Trustee of the United Mine Workers of America Combined Benefit Fund; WILLIAM P. HOPGOOD, Trustee of the United Mine Workers of America Combined Benefit Fund; THOMAS F. CONNORS, Trustee of the 1992 United Mine Workers of America Benefit Plan; ROBERT G. WALLACE, Trustee of the 1992 United Mine Workers of America Benefit Plan; UNITED STATES OF AMERICA (Intervenor in the District Court)

LTV Corporation (LTV), NACCO Industries, Inc. (NACCO); Amicus Curiae

On Appeal From the United States District Court For the Western District of Pennsylvania (D.C. Civ. No. 93-cv-01802) District Judge: Honorable D. Brooks Smith

Argued: November 20, 1998

Before: BECKER, Chief Judge, ALDISERT and WEIS, Circuit Judges.

(Filed March 29, 1999)

DAVID J. LAURENT, ESQUIRE
MICHAEL D. GLASS, ESQUIRE
Polito & Smock, P.C.
Suite 400 – Four Gateway Center
Pittsburgh, PA 15222-1207

ROBERT H. BORK, ESQUIRE
 (ARGUED)
1150 17th Street, N.W.
Washington, DC 20036

Attorneys for Unity Real Estate Co.

FRANK W. HUNGER, ESQUIRE
Assistant Attorney General
LINDA L. KELLY, ESQUIRE
United States Attorney
DOUGLAS N. LETTER, ESQUIRE
EDWARD R. COHEN, ESQUIRE
 (ARGUED)
SUSHMA SONI, ESQUIRE
Attorneys, Appellate Staff
Civil Division, Room 9014
United States Department of Justice
601 D Street, NW
Washington, DC 20530-0001

Counsel for the United States of
America

PETER BUSCEMI, ESQUIRE
 (ARGUED)
JOHN MILLS BARR, ESQUIRE
MARGARET S. IZZO, ESQUIRE
Morgan, Lewis & Bockius LLP
1800 M Street, N.W.
Washington, DC 20036

DAVID W. ALLEN, ESQUIRE
Office of the General Counsel
UMWA Health and Retirement
 Funds
4455 Connecticut Avenue, NW
Washington, DC 20008

JOHN R. MOONEY, ESQUIRE
MARILYN L. BAKER, ESQUIRE
Mooney, Green, Baker, Gibson &
 Saindon, P.C.
1341 G Street, NW, Suite 700
Washington, DC 20005

3

          RALPH A. FINIZIO, ESQUIRE
          Houston, Harbaugh
          Two Chatham Center, 12th Floor
          Pittsburgh, PA 15219

          Attorneys for UMWA Combined
          Benefit Fund and Its Trustees and
          UMWA 1992 Benefit Plan and its
          Trustees

          DONALD B. AYER, ESQUIRE
          GREGORY B. KATSAS, ESQUIRE
            (ARGUED)
          Jones, Day, Reavis & Pogue
          Metropolitan Square
          1450 G Street, NW
          Washington, DC 20005

          Attorneys for Amici Curiae
          The LTV Corporation and NACCO
          Industries, Inc.

OPINION OF THE COURT

BECKER, Chief Judge.

In Eastern Enterprises v. Apfel, 118 S. Ct. 2131 (1998), the Supreme Court held unconstitutional the portion of the 1992 Coal Industry Retiree Health Benefit Act (Coal Act), 26 U.S.C. SS 9701-9722 (1994 & Supp. II), that required former coal mine operators to pay for health benefits for retired miners and their dependents, as applied to a former operator who last signed a coal industry benefit agreement in 1964. In this case, we are asked to apply Eastern to former coal mine operators who were signatories to coal industry agreements in 1978 and thereafter. Eastern was decided by a sharply divided Court, and the parties disagree as to what, if any, principles commanded a majority.

The plaintiffs, Unity Real Estate ("Unity") and Barnes & Tucker Co. ("B&T"), challenge the Coal Act as applied to them as both a violation of substantive due process and an

4

unconstitutional uncompensated taking. Although it is an exceedingly close question, and we are highly sympathetic to plaintiffs' unfortunate situation, in which retroactively imposed liability operates to bind them to commitments they had thought satisfied when they left the coal industry, we conclude that the Act is constitutional as applied to these plaintiffs. Accordingly, their recourse must be to Congress rather than to the courts.

First, we conclude, albeit with substantial hesitation, that the Coal Act does not violate due process. Our due process inquiry proceeds in two parts. We acknowledge at the outset that there is a gap between what the contracts between the union and the mining companies required and what the Coal Act now mandates from those former mining companies. Because this is a substantive due process challenge, we accord deference to Congress's judgments, based on the report and recommendations of the Coal Commission. While reasonable minds could differ on the point, we are satisfied that the agreements signed by the plaintiffs in 1978 and thereafter promised that miners and their dependents would receive lifetime benefits from the benefit funds, and that, at all events, these agreements informed reasonable expectations that the benefits would continue for life. Similarly, we conclude that it was reasonable for Congress to conclude that the plaintiffs' withdrawal from the funds contributed to the funds' financial instability, though the agreements themselves permitted withdrawal. The history of coal mining in this country also supports Congress's decision to step in when the funds that provided health benefits to retired miners began to falter.

The question we must then answer is whether those congressional judgments provide enough of a rationale for closing the gap between the contracts and the needs of the benefit funds through the mechanism of the Coal Act. Consistent with our due process jurisprudence, we ask whether the Coal Act was a rational response to the problems Congress identified, taking into account the Act's retroactivity, which is highly disfavored in our legal culture. In light of Congress's findings and in the context of extensive government regulation of the coal industry, we

5

hold that it was not fundamentally unfair or unjust for Congress to conclude that the former coal companies should be responsible for paying for such benefits, even if they were no longer contractually obligated to pay into the benefit funds. The retroactive scope of this enactment, especially as applied to plaintiff Unity (eleven years), approaches the edge of permissible legislative action, but we cannot say that the law is beyond the legislative power.

We also decline to find a compensable taking on the ground that the Coal Act will put the plaintiffs out of business, because it is contrary to the reasoning of a majority of the Supreme Court in Eastern. Moreover, granting relief whenever a plaintiff could credibly argue that it would be driven out of business by a regulation would create major difficulties in evaluating the constitutionality of much modern legislation. We therefore decline to construe this regulatory burden as a "categorical taking" analogous to the total destruction of the value of a specific piece of real property.

I. Facts and Procedural History

A. History of the Coal Act

1. Early Agreements in the Coal Industry

The history behind the Coal Act has often been discussed in the pages of the federal reporters. See, e.g. , Eastern, 118 S. Ct. at 2137–42 (plurality). Briefly, the relevant facts are as follows: The coal industry has witnessed a series of particularly vitriolic labor disputes over the past half-century. In 1946, motivated principally by miners' demands for decent health and retirement benefits, the United Mine Workers of America ("UMWA") called a nationwide strike. To forestall industrial paralysis, President Truman nationalized the coal mines. Following the execution of what came to be known as the Krug-Lewis Agreement, the government relinquished control of the mines. The UMWA and the Bituminous Coal Operators' Association ("BCOA"), a multiemployer group of coal producers, then executed the first National Bituminous Coal Wage Agreement ("NBCWA"). The 1947 NBCWA specified terms and conditions of employment in the mines and, among other things,

extended the Krug-Lewis Agreement by providing health and pension benefits to miners.

A new NBCWA signed in 1950 provided that, in exchange for union concessions, the BCOA would create a welfare and retirement fund financed by a per ton levy on coal mined by signatory coal producers. The 1950 Fund was designed to receive employer contributions and to use the funds to provide health benefits to current and retired miners (and, in certain cases, to family members). Several more NBCWAs were signed over the next two decades. None of them altered this basic benefits format, although beginning in 1971 the UMWA and the BCOA were given power over the levels of benefits provided under the 1950 Fund, removing discretion formerly vested in the Trustees of the Fund. See In re Chateaugay Corp., 53 F.3d 478, 482 (2d Cir. 1995).

2. The 1974 Agreement

In 1974, demographic changes that had increased the cost of benefits, along with the passage of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. S 1001 et seq., led to a restructuring of the 1950 Fund. In its place, the 1974 NBCWA established four separate multiemployer plans, two covering pension benefits and two dealing with nonpension benefits. The nonpension entities were the 1950 Benefit Plan, which provided health benefits to coal workers who retired before 1976, and the 1974 Benefit Plan, which covered those who retired on or after January 1, 1976. The 1974 NBCWA explicitly guaranteed that miners and their dependents would retain their health services cards--which gave them access to Plan health benefits--"for life." No such express warranty had appeared in any earlier agreement. We will discuss these changes in more detail below. See infra Part III.

3. The 1978 Agreement

In response to continued labor unrest and unresolved concerns over benefits, the 1978 NBCWA incorporated a new provision assuring health care for "orphaned" miners (that is, miners whose employers had abandoned either the coal industry or the UMWA), together with complementary "guarantee" and "evergreen" provisions. The "guarantee"

7

clause obligated signatories to make sufficient contributions to maintain benefits at the negotiated levels during the period of agreement, whereas before there had been no promise to maintain any particular benefit level. The "evergreen" clause required signatories who continued to mine coal to continue making benefit contributions for as long as such contributions were required by future NBCWAs, regardless of whether a particular operator actually signed those subsequent NBCWAs. Additionally, the 1978 NBCWA for the first time defined specific health benefits that would be covered, a practice that continued in later agreements. Finally, for miners leaving covered service on or after January 1, 1976, primary responsibility for retiree health care coverage was shifted from the UMWA multiemployer system to individual coal companies, with the 1974 Plan retained as an "orphan" plan for retirees whose former employers went out of business.

4. The Coal Commission

The economic problems that prompted the remedial measures in the 1974 and 1978 NBCWAs continued to plague the industry. In particular, the cost of health care rose steeply throughout the 1980s, the number of orphaned miners increased dramatically as more and more employers left the industry, and an aging population swelled the retired miners' ranks. By 1990, contributions from a shrinking number of coal producers proved insufficient to fund the four benefit plans, and those plans were awash in red ink.

The UMWA struck the Pittston Coal Company for nearly 11 months in 1989–90. The Secretary of Labor intervened, brokered a rapprochement, and, as part of the negotiated settlement, set up a commission to study the industry's problems and recommend ways of rejuvenating the benefit plans. The Coal Commission issued its report in late 1990. Congress's response to the commission's suggestions took the form of the Coal Act. The Act folded the 1950 and 1974 Plans into a single UMWA–sponsored entity (the Combined Fund) and wove an elaborate tapestry designed to ensure that all retirees who were eligible to receive health benefits from the preexisting Plans would obtain them from the Combined Fund. The Act also created the 1992 Plan, which

was designed to provide benefits to eligible retirees and their dependents who were not beneficiaries of the Combined Fund and who were not receiving health care coverage directly from former employers.

The linchpin of the statutory scheme is contained in section 9706 of the Coal Act, which directs the assignment by the Social Security Commissioner of every eligible beneficiary to a "signatory operator" who is still "in business." The signatory operator ("SO") must have signed at least one NBCWA and must pay premiums to the Combined Fund sufficient to defray the estimated annualized health care costs for its assigned beneficiaries. See 26 U.S.C. S 9704.1 A retired miner is assigned first, if possible, to the SO that both signed the 1978 (or any subsequent) NBCWA and also employed him for at least two years more recently than any other SO. See id. S 9706(a)(1). If no SO fits that description, the retired miner is assigned to the 1978 (or any subsequent) SO that employed him most recently for any length of time. See id. S 9706(a)(2). If the retired miner never worked for a 1978 or subsequent SO that is still in business, he is assigned to the SO that employed him for the longest period of time. See id. S 9706(a)(3).

B. The Parties

1. Unity

Unity is a corporation owned by members of the Jamison family. Unity is covered by the Coal Act as a "related person" to several companies--formed by members of the Jamison family--that were ultimately absorbed into Unity. One, South Union-PA, had been mining coal since 1923 and signed the 1947 NBCWA and amendments thereto through 1961. South Union-WVA, which took up mining when South Union-PA left off, signed the 1974, 1978, and 1981 NBCWAs, although a bankruptcy court granted it

_____

1. The law also provides that SOs must pay an additional amount, proportional to the number of initial assignments, to provide coverage for orphaned retirees. However, it has apparently not proven necessary to assign SOs responsibility for orphaned retirees because of the availability of other funding sources. See Eastern, 118 S. Ct. at 2142 n.3 (plurality).

leave to reject the 1981 NBCWA in 1981. Yet another Jamison company, Stewart Coal & Coke Co., paid into the UMWA benefit funds from 1949 to 1958; when it ceased operations, it stopped paying into the benefit funds, but its former employees continued to receive benefits from the Funds. Other related companies signed NBCWAs and paid into UMWA benefit funds at various times from the 1960s through the 1970s.[2]

Unity currently owns a small commercial building and parking lot in Greensburg, Pennsylvania and employs two individuals, a corporate officer who earns $7,000 per year and a janitor. Its annual gross revenues are approximately $50,000 and its net worth is approximately $85,000. Unity was assigned 74 beneficiaries of the Combined Fund and owed the Fund, as of September 30, 1995, over $440,000 in unpaid premiums. In addition, Unity was assigned 2 beneficiaries of the 1992 Plan and, as of January 31, 1996, owed that Fund over $18,000. The assignment was based upon Unity's prior employment of 63 miners, who had worked for Unity and its related companies, on average, for ten years.[3] Unity represents that its Coal Act liabilities are over six times its total assets and that, if forced to pay, it will be bankrupted. These representations are not disputed by the Trustees.

2. B&T

B&T was assigned 1544 Combined Fund beneficiaries and some twenty 1992 Plan beneficiaries. B&T had been,

_____

2. While attempting to distance itself from liability, Unity and its owners
have not ignored the benefits of close corporate relationships. Although we do not suggest that it acted with bad faith, we note that Unity repaid the Jamison family over $230,000 from promissory notes given by Stewart Coal & Coke, which merged with Unity in 1969 (over $150,000 on those notes was paid in 1992 and 1993), and that Unity sheltered $288,000 in income from federal income tax because of net operating loss carryover from South Union–WVA's bankruptcy. At all events, Unity has never presented any legal challenge to the "related persons" provision of the Act, and hence its obligations must stand or fall regardless of how Unity was assigned the beneficiaries.

3. Thirty miners had worked for the companies for more than ten years and thirteen for more than fifteen years.

10

from 1905 on, engaged in large scale coal production until closing its last mining operation in 1986. It terminated an agreement to manage a mine effective January 1, 1987. At the peak of its coal mining operations from the 1970s to the 1980s, B&T employed approximately 1100 UMWA-represented miners. B&T was a party to the 1971, 1974, 1978, and 1981 NBCWAs through its membership in the coal operators' association. Although it withdrew from the association prior to the 1984 NBCWA, it later agreed to be bound by that NBCWA on a "me-too" basis, adhering to the Agreement's requirements. Its participation in the NBCWA terminated in 1988. At that time, B&T discontinued its individual employer plan and its retirees were left to be covered by the 1974 Benefit Plan (the "orphan" plan).

B&T's activities are currently confined to leasing its coal reserves, paying workers' compensation and black lung claims, and treating acid mine drainage from its closed mines. B&T claims that if it is forced to continue paying its Coal Act liabilities, all of its assets will be consumed in less than two years, and this is not in dispute.

C. Procedural History

The plaintiffs challenge the constitutionality of the Coal Act as it applies to them (S 9706(a)(1) & (2)). Both moved for preliminary injunctions to prevent the Trustees of the funds to which the plaintiffs are required to pay under the Coal Act from enforcing the Coal Act against them during the pendency of these cases. B&T withdrew its motion for a preliminary injunction, and the District Court granted Unity's motion for a preliminary injunction. The court rejected Unity's Due Process Clause argument but granted the requested interim relief on Takings Clause grounds. See Unity Real Estate Co. v. Hudson, 889 F. Supp. 818 (W.D. Pa. 1995). All parties moved for summary judgment. The District Court, reconsidering its views of the merits, granted the defendants' motions for summary judgment and denied Unity's and B&T's motions for summary judgment. Unity and B&T appeal.

11

II. The Eastern Decision

A. The Rationales

Eastern Enterprises was involved in coal mining until 1965, and signed every NBCWA from 1947 until 1964. It was assigned liability for over 1000 miners, based on Eastern's status as the pre-1978 signatory for whom the miners had worked for the longest period of time; its total liability was estimated to be between $50 and $100 million. Eastern sued, claiming that the Coal Act was unconsititutional.

Four Justices concluded that the Act was a compensable taking as to Eastern. In practical terms, this meant that the Act was unconstitutional: Compensation for the taking would be the return of sums required to be paid by the Act. Although the law did not work a physical invasion, the plurality noted that economic regulation can constitute a taking. See Eastern, 118 S. Ct. at 2146 (plurality). The plurality looked to three factors of particular significance in determining whether a taking had occurred: the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the retroactive character of the government action. See id. (plurality).

The plurality examined several previous cases to set the stage for its analysis. It looked to Usery v. Turner Elkhorn Mining Co., 428 U.S. 1 (1976), where the Court upheld provisions of the Black Lung Benefits Act, which required coal operators to compensate miners and their survivors for death or disability due to mining-related black lung disease. The Eastern plurality explained that Usery upheld that law because, even though "stricter limits may apply to Congress' authority when legislation operates in a retroactive manner," holding the companies liable for black lung benefits was justified as a rational measure to spread the costs of black lung to companies that profited from the miners' labor. Eastern, 118 S. Ct. at 2147 (plurality).

Next, the plurality considered Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717 (1984), where the Court upheld the Multiemployer Pension Plan Amendments Act (MPPAA), which was enacted to supplement ERISA. ERISA had created the Pension Benefit Guaranty

12

Corporation to exercise discretionary authority to pay benefits when a multiemployer pension plan terminated. The Corporation also had authority to require employers who had contributed to the plan during the five years before its termination to pay for an amount proportional to their share of contributions to the plan during thatfive-year period. As ERISA's effective date approached, many multiemployer pension plans were in a precarious position, and so Congress enacted the MPPAA, which imposed a payment obligation upon any employer withdrawing from such plans. The obligation depended on the employer's share of the plan's unfunded vested benefits.

The MPPAA applied retroactively to withdrawals within the five months preceding its enactment. The Eastern plurality explained that the Court upheld the MPPAA because retroactive liability prevented employers from taking advantage of a lengthy legislative process by withdrawing before Congress revised the law. The retroactivity in Gray, the Eastern plurality emphasized, was short, and limited to the needs generated by the delays inherent in the legislative process. See Eastern, 118 S. Ct. at 2147 (plurality).

The plurality then reviewed Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211 (1986), where the MPPAA was again at issue, this time as the subject of a takings challenge. The Eastern Court explained that Connolly upheld the law despite the employers' expectations that they would not have to pay, because "legislation is not unlawful solely because it upsets otherwise settled expectations." Eastern, 118 S. Ct. at 2148 (plurality). Even though the employers in Connolly had contractual agreements expressly limiting their contributions to the pension plan, the Court held that their express contracts could not impair Congress's authority. See Connolly, 475 U.S. at 223-24. The Connolly Court noted that the MPPAA did not work a physical invasion. Although the economic impact of the law was substantial, the amount was directly related to the previous relationship between the employer and its pension plan, and therefore the economic impact factor did not establish that a taking had occurred. See id. at 225. Moreover, there was no interference with reasonable

investment-backed expectations, because at the time the MPPAA was enacted, prudent employers had notice that pension plans were regulated and that withdrawal might trigger additional financial obligations. See id. at 227.

The third time was not the charm for the MPPAA's challengers in Concrete Pipe & Products, Inc. v. Construction Laborers Pension Trust, 508 U.S. 602 (1993). In that case, the employer focused on the fact that its contractual commitment to its pension plan did not impose withdrawal liability. The Court rejected the claim that the contract made a difference and reiterated its holding that there was no taking as long as an employer's liability would generally not be " `out of proportion to its experience with the plan.' " Id. at 645 (quoting Connolly, 475 U.S. at 226). Although the employer's liability under the MPPAA exceeded ERISA's original cap on withdrawal liability, the Court found "no reasonable basis to expect that [ERISA's] legal ceiling would never be lifted." Id. at 646. The employer voluntarily negotiated a plan within ERISA's scope, making its burden under the MPPAA neither unfair nor unjust. See id. at 646–47.

The Eastern plurality summarized this line of cases as follows:

> Our opinions in Turner Elkhorn, Connolly, and Concrete Pipe[ ] make clear that Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties. Congress also may impose retroactive liability to some degree, particularly where it is "confined to short and limited periods required by the practicalities of producing national legislation." Our decisions, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience.

Eastern, 118 S. Ct. at 2149 (plurality) (citation omitted). The plurality held that the Coal Act, as applied to Eastern, presented such an extreme case.

14

On the economic impact factor of the takings test, the plurality found "no doubt that the Coal Act has forced a considerable financial burden upon Eastern," between $50 and $100 million. Id. (plurality). The plurality referred to previous cases requiring that liability be proportional to a party's experience with the object of the challenged legislation. In the pension plan cases, the parties had voluntarily negotiated and maintained pension plans, at least for a while, and consequently their statutorily imposed liability was linked to their own conduct. See id. at 2149-50 (plurality). Eastern did not participate in the negotiations for the 1974 or subsequent NBCWAs, nor did it agree to make contributions thereunder. "[The 1974, 1978, and subsequent agreements] first suggest an industry commitment to the funding of lifetime health benefits for both retirees and their family members." Id. at 2150 (plurality).

The plurality then concluded that the Coal Act substantially interfered with Eastern's reasonable investment-backed expectations. See id. at 2151 (plurality). It reasoned that retroactivity is generally disfavored in the law, and that the length of the period of retroactivity and the extent of Eastern's liability raised substantial questions of fairness. See id. at 2152 (plurality). Finally, the plurality found the nature of the government action to be quite unusual, because the liability imposed was substantial, based on conduct thirty to fifty years in the past, and unrelated to any commitment Eastern made or injury it caused. See id. at 2153 (plurality).

The plurality declined to reach Eastern's substantive due process argument, although it noted that takings and due process analyses are often correlated. See id. (plurality); see also Connolly, 475 U.S. at 223. The plurality reiterated the Court's past concerns about using the "vague contours" of the due process clause to nullify laws. Eastern, 118 S. Ct. at 2153 (plurality) (citation omitted). Justice Thomas agreed with the plurality's Takings Clause analysis but wrote separately to reaffirm his belief that the Ex Post Facto Clause would also apply to Eastern's predicament. See id. at 2154 (Thomas, J., concurring).

15

Justice Kennedy concurred in the judgment, providing the critical fifth vote to strike the law down as applied to Eastern. He found takings analysis inapplicable: "The Coal Act imposes a staggering financial burden on the petitioner . . . but it regulates the former mine owner without regard to property. It does not operate upon or alter an identified property interest, and it is not applicable to or measured by a property interest." Id. at 2154 (Kennedy, J., concurring). Instead, he emphasized the law's distaste for retroactivity and found that the Coal Act's extreme retroactivity violated due process as applied to Eastern. See id. at 2158–59 (Kennedy, J., concurring). When the Court upheld retroactive legislation in the past, he noted, the statutes at issue were "remedial, designed to impose an actual, measurable cost of [the employer's] business which the employer had been able to avoid in the past." Id. at 2159 (Kennedy, J., concurring) (citation and internal quotation marks omitted) (alteration in original). Justice Kennedy concluded that "[s]tatutes may be invalidated on due process grounds only under the most egregious of circumstances. This case represents one of the rare instances in which even such a permissive standard has been violated." Id. (Kennedy, J., concurring).

Four Justices dissented, finding neither a taking nor a due process violation.

B. Drawing Instruction from Eastern: Does It Control This Case?

The splintered nature of the Court makes it difficult to distill a guiding principle from Eastern. There are five votes against the plurality's Takings Clause analysis. However, Justice Kennedy's substantive due process reasoning is not a "narrower" ground that we might take to constitute the controlling holding. There is a fundamental conceptual difference between a takings claim and a substantive due process claim. If the government pays just compensation, it may take property for public use under the Takings Clause. Due process protections, by contrast, define what the government may not require of a private party at all. It is the difference between a liability rule and a property rule. See Guido Calabresi & A. Douglas Melamed, Property Rules, Liability Rules, and Inalienability: One View of the

Cathedral, 85 Harv. L. Rev. 1089 (1972); Thomas W. Merrill, The Economics of Public Use, 72 Cornell L. Rev. 61, 66 (1986). To be sure, in this case the result of the two claims would be the same because the only potential taking is the imposition of a monetary obligation, but neither constitutional ground is a more limited version of the other.

Amici, other former coal companies, submit that the holding of Eastern is that employee benefits funding legislation is unconstitutional if it imposes substantial retroactive liability on selected employers, and if that liability is unrelated to injuries caused or promises made by those employers. While this may be reasonably accurate in a general sense, it does not provide guidance for determining how substantial is too substantial or how tight the fit between parties' past acts and the liability imposed on them must be. Nor does it help define an intersection between substantive due process and takings law, as the word "unconstitutional" is here being used to cover, if not a multitude of sins, at least two.

Eastern, therefore, mandates judgment for the plaintiffs only if they stand in a substantially identical position to Eastern Enterprises with respect to both the plurality and Justice Kennedy's concurrence. See Association of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1254–55 (D.C. Cir. 1998) [ABC, Inc.] (reaching the same conclusion about Eastern). In addition, we are bound to follow the five-four vote against the takings claim in Eastern, although we will consider plaintiffs'"categorical takings" claim, not presented in Eastern, in greater detail infra Part IV.

Because the plaintiffs signed NBCWAs in 1974 and thereafter, they are factually distinguishable from Eastern Enterprises. Language in the plurality and the concurrence suggesting that expectations fundamentally changed after 1974 supports our conclusion. See Eastern, 118 S. Ct. at 2150 (plurality) ([The 1974, 1978, and subsequent agreements] first suggest an industry commitment to the funding of lifetime health benefits for both retirees and their family members."); id. at 2159 (Kennedy, J., concurring); see also id. at 2161 (Stevens, J., dissenting) (stating that the miners' and operators' "implicit agreement

17

was made explicit in 1974"). Although we recognize that the Court was not presented with argument focused on post-1978 signatories and thus may not have had before it all the available evidence about later contracts, that very distinction compels the conclusion that Eastern is not on all fours with the case before us.

To the extent that Eastern embodies principles capable of broader application, we believe that due process analysis encompasses the relevant concerns. We must identify a set of calipers with which to evaluate the challenged provisions of the Coal Act, and we believe that the relevant measurement is the extent of the gap between the coal companies' contractual promises to the Funds and the requirements of the Coal Act. In making our decision, we first give deference to Congress's determination of the problem to be addressed, and then ask whether Congress's solution comports with fundamental principles of due process.

III. Retroactivity and Due Process

A. The Standard of Review

The standard of review when a substantive due process violation is alleged is forgiving; it bars only arbitrary and irrational congressional action. At the same time, our legal system has a long-standing and well-justified distaste for retroactive laws, because of their heightened potential for unfairness. See, e.g., Eastern, 118 S. Ct. at 2158 (Kennedy, J., concurring) (discussing our "singular distrust of retroactive statutes"); Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988).

The situation is not unlike that faced in Turner Broadcasting System, Inc. v. Federal Communications Commission, 117 S. Ct. 1174 (1997). In Turner, a case involving a First Amendment challenge to Congress's regulation of cable systems, the Court applied intermediate scrutiny and required substantial evidence justifying Congress's conclusion that regulation was necessary, but nonetheless emphasized the importance of deference to Congress:

18

> Our sole obligation is "to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." . . . [S]ubstantiality is to be measured in this context by a standard more deferential than we accord to judgments of an administrative agency. We owe Congress' findings deference in part because the institution "is far better equipped than the judiciary to `amass and evaluate the vast amounts of data' bearing upon" legislative questions. This principle has special significance in cases, like this one, involving congressional judgments concerning regulatory schemes of inherent complexity and assessments about the likely interaction of industries undergoing rapid economic and technological change. Though different in degree, the deference to Congress is in one respect akin to deference owed to administrative agencies because of their expertise. This is not the sum of the matter, however. We owe Congress' findings an additional measure of deference out of respect for its authority to exercise the legislative power. Even in the realm of First Amendment questions where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided and to the remedial measures adopted for that end, lest we infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy.

Id. at 1189 (citations omitted).

While we are not applying a First Amendment test to this due process claim, we consider Turner instructive in a situation such as this, where both careful scrutiny of the retroactivity involved and deference to the legislature's judgments about cognizable harms and appropriate remedies are in order. We must decide whether sufficient evidence exists to support Congress's judgment that post-1978 signatories of NBCWAs could justly be charged with responsibility for retirees' health benefits, based on the promises they made to coal miners and on the effects of their departure from the industry on the Funds. See also Concrete Pipe, 508 U.S. at 639 (Congress's judgment

19

receives deference even when its retroactive solution to a problem has some weaknesses). We will then evaluate whether it was rational for Congress to legislate to close the gap between the coal companies' promises and their contractual obligations, taking into account the retroactivity of the law.

B. Does the Evidence Support Congress's Conclusion that the Coal Companies Should Be Held Responsible?

1. The Relationship Between Benefits and Work Performed by Miners

Before we address the problems occasioned by the mass departure of coal companies from the industry in the 1980s and the expectations created by the NBCWAs, we mustfirst dispose of the plaintiffs' argument that the Coal Act is unjustified because it charges them with financial responsibility for non-coal-mining-related health problems.[4]

The plaintiffs submit that their liability is disproportionate to their actual responsibility because they are required to pay for miners' dependents and for all health conditions, however unrelated to mining work. Thus, they conclude, their liability does not depend in any rational way on benefits they received from the miners' work in the mines. That the company may be responsible

_____

4. The plaintiffs further argue that there is no reasonable relationship between their potential liability and the former employment relationships; they are responsible for the miners' dependents even if the miners only worked for them a day. This argument is skewed. In fact, the miners for which the plaintiffs are responsible worked for the plaintiffs, on average, for many years. There is no evidence in the record to suggest that the plaintiffs' hypothetical ever occurred; instead, the evidence indicates that Congress correctly found that many beneficiaries were entitled to benefits based on miners' long years of service with particular companies. Furthermore, one day of work would not qualify a miner for benefits under the statute, since a miner must work for twenty years in the industry or be disabled in the course of employment to qualify for benefits. See 26 U.S.C. S 9703(f); In re Chateaugay, 53 F.3d at 489. In combination with the statutory scheme of assigning beneficiaries to the SO for whom a covered miner worked longest, this initial eligibility requirement guards against the disquieting result posited by the plaintiffs.

20

for a miner's entire family does not make the burden unrelated to past benefits, however. While it is true that a miner's virility may have little to do with his productivity, the post-1978 agreements clearly provided for family coverage; when those agreements were signed, the companies could predict, with some actuarial reliability, their responsibilities for family benefits. Coverage for dependents was the price of labor peace, and the companies received a benefit from the promise of that coverage. See Nobel, 720 F. Supp. at 1178.

Proportionality does not require that the burdened parties have physically injured the beneficiaries of a retroactive law. The Eastern plurality relied on a concatenation of circumstances to find a lack of proportionality: First, the benefits were not related to work-related injuries, and, second, the benefits were not related to anything Eastern Enterprises ever promised. In Usery, the black lung benefit case, only the first factor was present and the law was upheld as proportional, while in Connolly only the second factor was present and the law was also upheld. Those cases demonstrate that the necessary proportionality may be of either type, and there is no need for both to be present. The argument to the contrary limits the coal companies' responsibility for their past actions to physical events. It makes more sense to recognize the relevance of the companies' promises and negotiations with the miners, especially since the NBCWAs were just as necessary to the companies' continued operations as blasting or digging.

2. Responsibility for the Funds' Instability

The defendants argue that B&T's and Unity's liability to the Funds is proportional to their general experience in the coal industry. The companies have only been assessed liability based on the miners they actually employed, and those miners' dependents. The Eastern plurality considered the former employment relationship alone insufficient because the employers had not promised lifetime benefits, at least until 1974, years after Eastern left the industry. See Eastern, 118 S. Ct. at 2150 (plurality). Unlike Eastern, however, Unity and B&T, as BCOA members, at some points in time negotiated for and adhered to the very

21

agreements that established the benefit funds at issue. Like the employers in Concrete Pipe and Connolly, their liability is linked to their voluntary negotiation of a benefit plan, even though Congress retroactively increased the costs of that negotiation. See Eastern, 118 S. Ct. at 2149–50 (plurality).

Moreover, it can credibly be contended that the departure of companies such as Unity's subsidiaries and B&T helped to create the financial crisis in the plans that ultimately led to the Coal Act. When B&T, along with several other employers, left the industry, litigation ensued. See United Mine Workers v. Nobel, 720 F. Supp. 1169 (W.D. Pa. 1989), aff 'd, 902 F.2d 1558 (3d Cir. 1990). As a consequence, the B&T retirees' benefits became funded by the 1974 Plan for orphaned miners. After these events, the Plan had to borrow funds and remaining employers were required to increase their contribution rates to make up the shortfall. Similarly, when South Union–WVA declared bankruptcy, it informed the Funds that it was no longer in business and would no longer provide health benefits for its retirees. As Mr. Jamison contemplated when he notified the Trustees that South Union–WVA had shut down, see J.A. at 170, the 1974 Fund was forced to take responsibility for those retirees. See Schifano v. United Mine Workers 1974 Benefit Plan & Trust, 655 F. Supp. 200 (N.D. W. Va. 1987) (litigation arising out of South Union–WVA's bankruptcy). Thus, the plaintiffs' acts increased the burden on the Fund, contributing to its overstressed state, at least to some degree.

Although the Fund may, as plaintiffs argue, have been financially stable when the plaintiffs left the industry, it was surely foreseeable that departures would lead to instability, given the benefit funding structure under the NBCWAs. While the plaintiffs contend that the benefit funds only became unstable after the plaintiffs left the industry and there were changes in the contribution levels required from coal operators who remained in the industry, it was also foreseeable that those contribution levels could change, and it was the NBCWAs to which the plaintiffs adhered that initially created a system vulnerable to such changes. It was thus rational to conclude that operators in

22

this position should bear some responsibility for the costs of the corrective legislation. "It is surely proper for Congress to legislate retrospectively to ensure that costs of a program are borne by the entire class of persons that Congress rationally believes should bear them." United States v. Sperry Corp., 493 U.S. 52, 65 (1989).

The plaintiffs argue that holding them responsible for the benefit funds' financial instability because they left the coal industry would obligate every operator to remain in the industry no matter how unprofitable mining became, which amounts to an "erosion taking." We disagree, since this is simply a variant of the total takings claim that we reject below. The law does not require the plaintiffs to stay in any business, which was a necessary element of all the prior "erosion taking" cases. See, e.g., Brooks–Scanlon Co. v. Railroad Comm'n, 251 U.S. 396, 399 (1920) (legislature cannot require a company to continue doing business, though it may require the company to fulfill its legal obligations if it chooses to continue operations). Instead, the Coal Act merely recognizes that all acts have consequences, and that sometimes it is not permissible for a company simply to walk away, leaving its former employees in the lurch.

In ABC, Inc., the Court of Appeals for the D.C. Circuit relied heavily on the distinction between pre–1974 participation in the coal industry and post–1974 participation. The court found the distinction relevant for two reasons: the post–1974 agreements began the explicit promises of lifetime benefits, a matter we take up below, and also created a funding structure that allowed (or even induced) companies to leave the industry and slough off the burden of their retirees' benefits on the remaining companies. Before 1974, a company that left the industry did not create any obligations on the part of other companies to increase contributions to the benefit funds, but after 1974 that changed. Judge Silberman reasoned persuasively:

> [I]t is surely rational for the Congress to expect that the member companies' failure to contribute while their retirees received benefits contributed to the underlying crisis that the plans faced in the late 1980s. Although

23

> the coal contractors may not have been the dominant
> cause of that underfunding, legislation need not
> burden the most responsible party to survive rational
> basis review.

ABC, Inc., 156 F.3d at 1255-56.

ABC, Inc. also found that Justice Kennedy's additional concern that liability imposed based on a past employment relationship should be "remedial" was satisfied for employers who, unlike Eastern, withdrew from the industry after the 1974 agreements. Such employers "withdrew from their prior commitment to contribute to the funds at precisely the point in time . . . at which the benefit obligation dramatically expanded, and therefore `contributed to the perilous financial condition of the 1950 and 1974 plans which put the benefits in jeopardy.' " Id. at 1257 (quoting Eastern, 118 S. Ct. at 2159 (Kennedy, J., concurring)).

Unlike Eastern, Unity and B&T, as BCOA members, participated in the negotiations that created the post-1978 funding structure. They benefited from the NBCWAs by obtaining labor peace. Although the contract allowed the companies to unload their obligations to the retirees onto the Trustees, they should reasonably have anticipated that such a strategy would threaten the Funds and might well prompt a congressional response. We cannot say that it was irrational for Congress to charge the miners' former employers with the costs of their benefits, when the miners qualified for lifetime benefits from the Trustees because of their former employment (we expand on this point infra) and the employers' departure from the industry contributed to the problem confronting the Trustees.

B&T and Unity urge that they are not responsible for most of the burden on the Funds. However, B&T was a large employer, whose departure from the industry added over a thousand beneficiaries to the Funds' "orphans," and its individual impact was therefore significant. In addition, Unity may be held partially responsible because, though its individual contribution to the problem was small, the aggregate effects of its actions and parallel actions by other companies contributed to the problem. Congress may

24

reasonably include all of the parties whose acts, taken together, gave rise to a problem, even if the individual contributions of each are small. Cf. Wickard v. Filburn, 317 U.S. 111, 127–28 (1942) (applying the same reasoning to Congress's Commerce Clause power).

3. The Background of Government Regulation

We consider the background of government regulation significant as well. The coal industry has been heavily regulated for decades, including the government–imposed 1948 Krug–Lewis Agreement, which created the basic health benefits structure. The companies had no reasonable expectation that the government would not expand its regulation of health benefits in the coal industry, given the history of labor unrest and government intervention. See 136 Cong. Rec. S17814 (daily ed. Oct. 27, 1990) (statement of Sen. Glenn) (containing Congressional Research Service report on the extensive history of federal intervention into the health status and benefits of coal workers and into labor relations in the coal industry more generally).5

The coal operators were also aware of the growing number of government requirements that vested benefits be paid, whether or not an employer was contractually obligated to pay for them, as the industry's response to ERISA indicated. The situation is thus analogous to those in Connolly and Concrete Pipe, in which the Court found that, in light of the history of federal pension regulation, employers could not reasonably assume after 1978 that their obligations to pension funds would never exceed the specific terms of their contracts, see Connolly, 475 U.S. at 227, nor could they reasonably assume that Congress would not increase the statutory cap on ERISA withdrawal liability, see Concrete Pipe, 508 U.S. at 646. The parties were well aware that pension plans could subject employers to retroactive liability in cases of underfunding, and could

_____

5. Indeed, amicus LTV was the specific target of at least one bill to mandate that it continue to fund health benefits for its retired miners as early as 1986. See 132 Cong. Rec. S9879 (daily ed. July 30, 1986) (bill discussed by Sens. Byrd, Dole, Durenberger, Glenn, Heinz, & Specter); id. at E2714 (daily ed. Aug. 1, 1986) (statement of Rep. Rahall).

have foreseen that Congress might act similarly with respect to health benefits.

4. The Contractual Language

Turning to the expectations created by the contracts, the threshold question is whether we need to distinguish between explicit and implicit promises of lifetime benefits. Although the plaintiffs concentrate on explicit promises, an issue on which their position is strong, we think that explicit promises are not necessary in order to justify congressional action. The question is what reasonable expectations the coal companies' actions created. While an expectation cannot be reasonable without some foundation in the real world, an explicit representation that the companies would provide lifetime benefits is not required, since reasonable expectations may arise from a consistent course of conduct as well.

Plaintiffs and amici argue that the coal companies never made any promises, implicit or explicit, or raised any expectations of lifetime benefits. They first point to the text of the NBCWAs, which did not themselves require the coal companies to provide lifetime benefits under all circumstances. They dissect the various contractual provisions and characterize their import as follows: (1) the health card that miners received for benefits"for life" did not guarantee any specific benefits; (2) the"evergreen" clauses only referred to an employer commitment to continue funding benefits, but did not promise anything about the scope of those benefits; (3) the "evergreen" clauses only applied to operators who stayed in the coal business; (4) the contracts allowed benefits to be suspended or reduced; and (5) the guarantee of benefits lasted only through the term of the agreement. Additionally, an UMWA negotiatior testified in the course of other litigation that everything was up for renegotiation at the end of a contract and that the parties could have agreed to eliminate benefits entirely. See District 17, UMWA v. Allied Corp., 735 F.2d 121, 126 (4th Cir. 1984), vacated, 765 F.2d 412 (4th Cir. 1985).

It is true that the funding contribution requirements were limited to the life of the agreement, "ending when this

26

Agreement is terminated," in 1978 and subsequent NBCWAs. Yet all of these arguments have the same fundamental weakness, which is that they go to the contract and not to the reasonable expectations that might have been created by the contract. The UMWA negotiator's testimony is a particularly strong example of this: the parties could have agreed to eliminate benefits in any given negotiation, but there was no realistic chance that they would. The defendants do not dispute that the contracts did not provide for the payments mandated by the Coal Act. If the contracts had so provided, the Coal Act would have been unnecessary. The plaintiffs' dissection of the contracts is a brilliant exercise, and were we deciding a case on labor and contract law principles the outcome would be clear in their favor.6 But this is not an action brought for contractual violations. We focus our attention instead on what conclusions Congress might rationally draw about the parties' relations and expectations, and what it might fairly do to close the gap between the contractual obligations of the coal companies and the Funds' actual liabilities.

The NBCWAs did not in themselves guarantee that the coal companies would pay for lifetime benefits for retirees and their dependents. There thus is a tenable argument that the NBCWAs did not obligate the Trustees of the Funds to pay lifetime benefits, because the evolution of the benefit structure did not indisputably culminate in a lifetime guarantee. Indeed, the former coal companies have a number of strong arguments, and reasonable people could well disagree about Congress's choice to impose liability on them. Nonetheless, we conclude that Congress could reasonably have reached the conclusions it did about the expectation of lifetime benefits and about the coal companies' responsibility for the situation in which the Funds found themselves after the changes of the 1970s and 1980s.

_____

6. However, not all of these arguments are persuasive even as a matter of contractual interpretation. As we discuss below, after 1978 health benefits were specified in the contract, and that the evergreen clause and the health card sections of the agreement did not rescribe the other sections of the contract does not mean that those specifications were without effect.

27

### a. Contractual Clarity

The plaintiffs submit that Eastern turned on the fact that the relevant NBCWA provisions clearly did not provide for lifetime benefits. We believe that this is a subtle but significant "spin" on the plurality's view, which found that the obligations imposed on Eastern were unrelated to its contractual obligations. The plurality noted that, during Eastern's participation in the industry, retirement and health benefits were far less extensive than they later became; the benefits were also not vested. Furthermore, benefits were subject to alteration or termination with far fewer constraints than those later imposed by the shift of control from the Trustees to the BCOA and the UMWA. In fact, entire categories of beneficiaries provided for under the Coal Act were not part of the older NBCWAs, and "Eastern could not have contemplated liability for the provision of lifetime benefits to the widows of deceased miners." Eastern, 118 S. Ct. at 2150 (plurality). All these facts meant that there was no rational relationship between Eastern's past acts and its Coal Act-imposed obligations.

If Connolly retains any force, as we think it does, the clarity of contractual provisions is far from dispositive. Connolly itself involved a contract whose limits were at least as clear as those in the contracts at issue here. Even crystalline contractual provisions, accompanied by well-established practice and understandings, can create reasonable expectations extending beyond the four corners of a contract. Though courts may be unable to enforce those expectations, Congress is not so constrained. We believe that our position is bolstered by a careful reading of the Eastern plurality opinion, which did not suggest that an implicit promise (that is, one not clearly found in the contract) would be insufficient to sustain the Coal Act if that promise had a reasonable basis in actual practice or in the penumbra created by contractual promises. Instead, the plurality found no evidence of any implied lifetime promise. See Eastern, 118 S. Ct. at 2152 (plurality). Justice Kennedy, likewise, focused not on the clarity of the contract but on the lack of a connection between pre-1978 coal operators and retired miners' reasonable expectations and instability in the benefit structure. See id. at 2159 (Kennedy, J., concurring).

### b. Lifetime Benefits

The plaintiffs argue that the NBCWAs never promised "lifetime benefits," and that the miners' only reasonable expectation based on the NBCWAs would have been that any operators who remained in the coal industry and continued to sign agreements would pay for their benefits indefinitely. From that perspective, the Coal Act retroactively transformed a series of three- or four-year commitments into an open-ended, decades-long obligation.

The plaintiffs' reading of the agreements is too crabbed. The 1974 NBCWA has thirteen separate references to health service cards "for life" or "until death." Plaintiffs submit that this simply referred to a health card that no one would ever take away but that could be reduced to a worthless piece of paper at any time. However, not only did the 1978 NBCWA have sixteen separate references to coverage "for life" or "until death," it also refers to an "entitle[ment] to receive health benefits until death" in at least one section. 1978 NBCWA, Art. XX, at 116. The plaintiffs submit that this reference was inextricably linked to the references to health service cards. We agree, but think that the slippage between lifetime health cards and lifetime health benefits counsels against the plaintiffs' position: The lifetime health card may just as easily be seen as a shorthand reference to lifetime benefits, which may be why the parties did not correct (in this carefully negotiated contract) the reference to "benefits until death."[7] This language, synonymous with the health card language, appears to reflect the bargaining parties' understanding that the lifetime provision of health benefits was an absolute requirement for any contract. See Nobel, 720 F. Supp. at 1175 (finding that the coal operators understood that lifetime benefit language was crucial to the ratification of any contract and that the BCOA therefore abandoned its attempt to remove such language).

_____

[7]. The plaintiffs also note that the "benefits until death" language appears in a provision discussing restrictions on benefits whenever the beneficiary exceeded the earnings limit. However, the point of the provision was that the beneficiaries were entitled to benefits during any period that they did not exceed the earnings limits until death.

29

We do not rest our decision on the reference to "benefits until death"; rather, it is a datum supporting the overall conclusion that the health card was expected to guarantee benefits for life. The 1981 and 1984 NBCWAs continue in the same vein with sixteen references to coverage "for life" or "until death." While we appreciate the force of the plaintiffs' arguments to the contrary, we are persuaded that it would have been reasonable for miners to expect that the "lifetime" health card actually meant that lifetime benefits would be provided to anyone in possession of a health card.

Plaintiffs nonetheless argue that the appearance of the phrases "for life" and "until death" in the 1974 and subsequent agreements does not imply any commitment to provide lifetime benefits. According to them, we should understand the lifetime health card as doing no more than serving the valuable administrative function of ensuring portability. At most, the plaintiffs argue, the possession of a health card merely entitles a retiree to whatever benefits, if any, were available under the NBCWA then in effect. The plaintiffs interpret "lifetime" to mean simply that, if an NBCWA were in place, miners could not lose their benefits after a fixed period of time (a problem that had arisen in the past when the Trustees cut off retired miners after five years or some other fixed period).

This is a strained reading of the terms "for life" and "until death," which refer to persons (the miners and their dependents) and not to the continued existence of an NBCWA. Furthermore, this argument does not aid the plaintiffs much, as NBCWAs were in effect through the passage of the Coal Act and even to this day, although the plaintiffs are no longer signatories to them. There is no real-world difference between a lifetime guarantee and a guarantee that lasts while NBCWAs continue to exist, especially as the guarantee did not depend on any particular employer's continued adherence to the NBCWAs. The fact that NBCWAs continue is evidence that it was reasonable to expect them to continue, and thus that it was reasonable to expect that a "lifetime" guarantee, even one that could theoretically expire if the entire NBCWA system collapsed, was in reality a lifetime guarantee. Cf. D'Amico v. City of New York, 132 F.3d 145, 151 (2d Cir. 1998)

30

(reasoning that the occurrence of an event is evidence that a decisionmaker was justified in predicting that event).

The plaintiffs further point out that the 1950 and 1974 Plans contained language stating that, if assets became insufficient, benefits could be suspended or reduced. The Plans were incorporated into the 1974, 1978, 1981, and 1984 NBCWAs by reference. Moreover, the plaintiffs note that the Plans were subject to modification or amendment, and there were provisions that would take effect "[i]n the event of the termination of the 1950 Plan." The plaintiffs also contend that when miners received health cards, they were specifically told that their benefits were subject to amendment or termination "at any time." 1958 Annual Report. Of course, later NBCWAs were designed to limit the Trustees' authority to do so, by defining the benefits to be provided, by establishing lifetime eligibility for a health card, and by eliminating the Trustees' ability to alter benefits without the consent of the union and the BCOA after 1971.

But the NBCWAs always clearly stated that they were in effect for limited terms. The individual employer plans for health benefits that were established under the 1978 NBCWA, like the 1950 and 1974 Plans, had the stated purpose of providing benefits "during the term of this Agreement." The plaintiffs conflate the issue of whether the coal companies' contribution requirements were "lifetime," which they clearly were not under the contract, with the issue of whether the contracts provided for lifetime health benefits. The lifetime health card was intended to put an end to the Trustees' pre–1974 practices of cutting beneficiaries off if their former employers were delinquent in paying into the Funds or if they had received benefits for a set period of time. Thus, the Trustees could reasonably be seen as required to pay lifetime benefits to all retirees and their dependents in possession of a health card; the contractual terms had the effect of binding the Trustees to a lifetime commitment, although they did not of themselves bind the coal companies to the same commitment. 8

_____

8. The plaintiffs also argue that the Trustees understood that benefits were limited to the term of the agreement. When the 1974 NBCWA

Despite the plaintiffs' contention that the numerous cases holding that "for life" means lifetime benefits were wrongly decided, we are unpersuaded that those cases lacked support for their conclusion. See, e.g., In re Chateaugay Corp., 945 F.2d 1205, 1210 (2d Cir. 1991); District 29, UMWA v. UMWA 1974 Benefit Plan & Trust, 826 F.2d 280, 282-83 (4th Cir. 1987); Grubbs v. UMWA, 723 F. Supp. 123, 128 (W.D. Ark. 1989); Nobel, 720 F. Supp. at 1178.9 The plaintiffs assert that, at all events, Eastern throws these cases into doubt. We disagree, because the Supreme Court said nothing about the Trustees' obligations, nor did the Court take up the post-1978 contracts at all.

Furthermore, contrary to the submission of the plaintiffs, these lower court cases did analyze the provisions of the contract, recognizing that the Trustees were obligated to provide benefits only "during the term of this agreement," just as the companies were only required to contribute during the term of the contract. Rather than ignoring this temporal language, the decisions found that other language in the contract, combined with testimony from the

_____

expired on December 6, 1977, the Trustees stopped providing health benefits to retired miners, and the subsequently negotiated 1978 NBCWA prohibited retroactive funding of such benefits. This is significant, but, given that the benefit funds were fundamentally reconfigured at the same time to focus on individual employers, it would have been difficult to deal with those few months retroactively during the transition to the new regime. The short gap necessitated by the delay in negotiating a new contract during bitter labor strife does not disprove the general promise of lifetime benefits in the future.

9. UMWA Health & Retirement Funds v. Robinson, 455 U.S. 562 (1982), also refers to "lifetime" benefits. See id. at 565-66. The plaintiffs argue
that NBCWAs were in place at all times relevant to Robinson, and so that case provides no basis for suggesting that benefits would be available in the absence of an NBCWA. However, this argument actually favors the defendants. We reiterate that we are not construing the contract but deciding what reasonable expectations it might generate. In that analysis, the fact that NBCWAs persisted for decades, although it was always possible that they would expire, favors the defendants, since the long history of NBCWA renegotiation makes the expectation that benefits would continue more reasonable.

32

negotiators, obligated the Trustees to provide lifetime benefits. See District 29, UMWA, 826 F.2d at 282. That the contracts may contain contradictory language does not, as plaintiffs and amici contend, make any construction requiring lifetime benefits unreasonable; instead, there was evidence pointing in both directions. Just as it was not unreasonable for courts to conclude that the contracts provided lifetime benefits, it was not unreasonable for Congress to rely on similar evidence, even though Congress could also reasonably have disagreed. In fact, we could even consider such judicial decisions, the earliest of which were referenced in the Coal Commission Report, as data justifying Congress's conclusion that lifetime benefits were promised, since Congress may reasonably look to the findings of a coordinate branch. See Coal Comm'n Report at 3, 28, 47, 55–56.

The question, then, is not whether the health benefits are truly "for life" but whether the former coal companies can justly be associated with the promises of lifetime benefits that by contract run only against the Trustees. The argument is that it was acceptable, by virtue of the contractual limitations, for companies to walk away and leave the Trustees and the companies remaining in the coal industry to pay the tab. And it is this underlying claim that we think Congress could rationally reject. In this regard, we reiterate that our obligation is to determine what Congress could reasonably have found.

Congress certainly possessed credible evidence that miners expected those benefits. The Coal Commission, for example, reported to Congress in 1990 that

> Retired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years. That commitment should be honored.

Id. at vii. The Commission based its conclusions on substantial evidence, including testimony from many industry participants on both sides of the issue. Even a dissenting member of the Commission, who was the president of a coal company, acknowledged that the post-

33

1978 agreements created a promise of lifetime benefits. See id. at 81 (statement of Commissioner Holsten). 10 Although the Coal Act's statutory scheme was proposed nine and two years, respectively, after Unity and B&T ceased to be bound by an NBCWA, and that is certainly a significant period of time, we cannot say that it is beyond the pale in light of the lifetime nature of the commitment at issue.

### c. Other Contractual Provisions

The negotiations of the 1970s took place in a changing legal context, as the Coal Commission's report to Congress recognized. ERISA made clear that employers who promised pension benefits were going to have to give them, and when the parties negotiated the 1974 and later agreements, that idea was certainly in mind. Moreover, starting in 1974, the new agreements removed the Trustees' discretion to set benefit levels and eligibility standards. See Coal Comm'n Report at 24.

By 1977, anxiety had intensified, and the miners struck for nearly four months over, among other things, health benefit issues. The federal government intervened to settle the strike. The 1978 agreement introduced the "evergreen"

_____

10. The conclusions of the Coal Commission Report are not rendered suspect by Eastern; although the plurality and Justice Kennedy concluded that Congress could not reasonably decide that pre-1978 signatories were responsible for creating expectations of lifetime benefits,
it is notable that the Coal Commission never proposed the "super reachback" provision challenged in Eastern. See Eastern, 118 S. Ct. at 2141 (plurality); Coal Comm'n Report at 61, 63, Supp. App. at 420, 422. The Commission's proposal provided for liability under what became S 9706(a)(1) and S 9706(a)(2), which only apply to post-1978 signatories, while S 9706(a)(3) was added late in the legislative process. See J. Atwood Ives, Federal Document Clearing House Congressional Testimony, House Ways & Means Oversight, Coal Workers Retirement Benefits, June 22, 1995. The Coal Commission'sfindings remain persuasive evidence from which Congress could conclude that signatory operators remaining in the coal industry after 1978 created a reasonable expectation of lifetime benefits among miners and their families. See also 138 Cong. Rec. S5081, S5082 (daily ed. Apr. 8, 1992) (statement of Sen. Boren) (referring to the expectations created by the 1978 agreement); id. (statement of Sen. Dole) (same).

34

and "guarantee" clauses and rearranged the benefit funds in major ways. See id. at 26. The evergreen clause only applied to companies that stayed in the coal mining industry. As such, it has no bearing on these plaintiffs except insofar as it expresses an intent by the negotiators to keep health benefits funded, as the miners expected them to be, in the context of growing burdens on NBCWA coal operators.

Under the guarantee clause, signatory employers committed to make the contributions necessary to maintain the contractually specified benefits throughout the term of the agreement, even if that required an increase in the contribution rates specified at the outset of the contract term. This was essentially a shift "from a defined contribution obligation, under which employers were responsible only for a predetermined amount of royalties, to a form of defined benefit obligation, under which employers were to fund specific benefits." Eastern, 118 S. Ct. at 2140 (plurality). The evergreen clause represented a similar effort by the bargaining parties to protect the funding base for ongoing health coverage.

The coal companies contend that everyone recognized that, when the contract ended, the benefits would end. The 1978 guarantee clause guaranteed benefits and provided for increased contribution if necessary only "during the term of this Agreement." The defendants respond that the "end of contract/end of benefits" equation is not the end of the story. They argue that it was reasonable for the miners to expect that the contract would be replaced by another contract, and then another, and then another, with at least comparable benefits, even if the industry and its participants changed. After all, that is what had taken place for the past fifty years: the slow but steady expansion of benefits. The NBCWAs, they argue, were negotiated in a context where the miners believed that, in return for wage and employment concessions, they would be able to guarantee their futures. In fact, as noted above, the NBCWAs have endured for decades after the changes of the 1970s, evidencing the reasonableness of a belief that the agreements would continue.

35

We do not ignore the plaintiffs' history in the industry, which extended for many decades and ended over thirty years after Eastern Enterprises left the coal industry. Unity mined coal for 58 years and B&T for 80. Coal companies such as Unity and B&T received benefits from the steady expansion of health and retirement benefits, including wage concessions and union agreement to mechanization, during that period. Their long-term participation made it particularly understandable that miners would expect that the companies' adherence to promises of lifetime benefits in the NBCWAs would be honored.

5. Conclusion

Our review of the evidence suggests that there are several plausible interpretations of the events leading up to the Coal Act. It could well be the case that former coal companies are not the most responsible parties in the deterioration of the health of the benefit funds, but Congress could also rationally find that they bore significant responsibility in setting up a structure that invited operators to abandon mining and shunt the burden of caring for retirees on other parties. Similarly, it could be that the contracts did not create a lifetime benefit obligation on the part of the Trustees, yet Congress had substantial evidence to the contrary. We will defer to Congress's judgments on the nature of the problem before it, including judgments about causation and reasonable expectations. The next question, therefore, is whether Congress's reasonable evaluations of the problem justified the corrective measures it mandated in the Coal Act.

C. Is the Coal Act a Rational Response to the Problem Congress Identified?

Given that evidence exists to support Congress's interpretation of the history of the coal industry and the NBCWAs, we must ask whether that evidence is enough to justify a retroactive law of this scope. For the following reasons, we conclude that the Coal Act's retroactivity does not render it irrational in violation of due process.

1. The Length of the Retroactivity

The heart of retroactivity analysis is an evaluation of the

36

extent of the burden imposed by a retroactive law in relation to the burdened parties' prior acts. We note as an initial matter that the length of the retroactivity alone is not dispositive in this case. The retroactivity is significantly less extensive than that in Eastern. We evaluate retroactivity not from the time the plaintiffs first signed an industry agreement, nor from the time the miners' right to benefits accrued, but rather from the end of the plaintiffs' contractual obligations to pay for such benefits. 11 For Unity, that period is eleven years, and for B&T four years, because B&T was bound by the 1984 NBCWA until 1988. This is substantially less time than the gap between Eastern's exit from the coal business and the enactment of the Coal Act, although, at least for Unity, it is still quite long.12 We conclude that this degree of retroactivity is not so extensive as to violate Justice Kennedy's standard, although Unity offers a close case.13

_____

11. We choose the expiration of NBCWA obligations because, although covered retirees may have stopped working for the plaintiffs before those dates, the contracts obligated the plaintiffs to continue paying for benefits until those contracts expired and, after 1978's evergreen clause, until the plaintiffs left the industry. This was not true of the relevant contracts in Eastern. Thus, the retroactivity extends not from the date of the miners' retirement but from the period during which the plaintiffs were free of any contractual obligation to pay for benefits.

12. The retroactivity approved in Usery was actually much greater in some circumstances. The black lung law was enacted in 1969 and began imposing liability on employers in 1973. Yet benefits were given to miners who left mine work as early as 1923. See Usery, 428 U.S. at 40 n.4 (Powell, J., concurring in part). In addition, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. SS 9601–9657, has an unlimited retrospective temporal reach, which has yet to be invalidated by any court to consider the issue. See, e.g., United States v. Monsanto Co., 858 F.2d 160, 173–74 (4th Cir. 1988).

13. We focus on Justice Kennedy's explication of the relevant due process principles because the plurality did not reach Eastern's due process claim. See Rappa v. New Castle County , 18 F.3d 1043, 1058–61 (3d Cir. 1994) (where "no single approach can be said to have the support of a majority of the Court," then "no particular standard constitutes the law of the land" and lower courts are bound by the result as applied to "substantially identical" cases).

37

Instead of relying solely on the length of the retroactivity, we assess the relationship of the retroactively imposed liability to the governmental interests asserted in its defense. See Eastern, 118 S. Ct. at 2159 (Kennedy, J., concurring) (retroactive remedies must bear "a legitimate relation to the interest which the Government asserts supports the statute"); id. at 2163 (Breyer, J., dissenting) ("[A] law that is fundamentally unfair because of its retroactivity is a law which is basically arbitrary.").

The plaintiffs argue that retroactivity has only been upheld in three situations: (1) where the employer continues to operate in the regulated industry after the enactment of a retroactive law; (2) when employers would otherwise be able to take advantage of the delays inherent in the legislative process; and (3) where a worker's injury or illness is related to his or her work. This categorization is unsatisfactory. The first category lacks adequate analytical foundation. If a law is truly retroactive, applying to conduct completed before the law was enacted, it would seem only marginally relevant that an employer kept doing what it had been doing before, for the liability would be based on past acts, not post-enactment acts; the continuation in the old business would not seem to justify the retroactivity. If it would be fundamentally unfair to make a business pay for its long-past acts, it would seem equally unfair to put that business to the choice of leaving its established business or paying for its long-past acts.

We posit a different standard: Where Congress acts reasonably to redress an injury caused or to enforce an expectation created by a party, it can do so retroactively. The ERISA and MPPAA cases establish that Congress may retroactively bar employers from giving their employees vested pensions in multiemployer plans and then leaving those plans to collapse. Those cases did not examine whether the employers continued to operate the same kind of business as they did when their former employees' pensions became vested. Our categorization also recognizes that workers can be harmed not just by late-appearing physical consequences of their jobs but also by an employer's failure to live up to a long-term promise that formed part of the worker's reasonable expectations on the

38

job. Both a promise of benefits and a job-related illness have a nexus to the worker's employment, as we discussed supra Subsection III.B.1.

## 2. The Size of the Burden

The amici (other former coal operators) call our attention to the size of the burden imposed, arguing that, because the Eastern plurality found that paying lifetime benefits imposed a "considerable" burden on Eastern Enterprises, by definition the same is true for all other entities required to pay benefits under the Coal Act, since the amount of the payment per beneficiary is the same under every part of the law. In Eastern, however, the total amount at issue was between $50 and $100 million, whereas here the total cost is well under $1 million to date for Unity and around $2.5 million per year for B&T, an amount that will continue to decrease as beneficiaries die. Therefore, the plaintiffs are not in the same situation as Eastern Enterprises.

We will not find a due process violation if the regulation is proportional to the harm legitimately addressed by the legislature. Yet the proportionality requirement will only be applied when the harm inflicted by the government is substantial enough to raise an issue as to whether a violation of due process has occurred. As the total absolute burden imposed by a statute increases, it becomes simpler for a court to determine that the legislature has exceeded the bounds of rationality, whereas a smaller burden means that Congress's error, if any, is less likely to justify the extreme sanction of invalidation on due process grounds.

If, for example, Congress imposed a one-dollar burden on each member of some industry, and we concluded thatfive cents was the only amount that could be linked to Congress's asserted justification for the burden, we would still be disinclined to strike down the statute; the fact that the burden imposed was twenty times the actual cost would not be determinative. As the actual amount of the burden decreases, errors in its calculation increase in relative magnitude, but the leeway given to Congress in enacting social and economic legislation mandates that we look to absolute rather than relative magnitudes, so that our review is limited to those laws that work the most severe disruptions of settled expectations.

39

For similar reasons, we doubt that a former coal company would have a credible claim of "considerable" burden if it were only responsible for a small number of beneficiaries under the Act, even if the company was in such dire financial straits that the liability would push it over the economic edge. It is the aggregate cost--the total size of the burden imposed--and not the per-beneficiary cost that is significant under our due process jurisprudence. While the burden in this case is certainly substantial, and thus we will carefully scrutinize the Coal Act, the burden is not dispositive in itself. We acknowledge that the Coal Act will put these particular plaintiffs out of business, but that fact is again a matter of relative burden, not absolute burden and, because it does not determine the due process issue, we reserve our discussion of this consideration for our analysis of the plaintiffs' takings challenge infra Part IV.

3. Proportionality and Congress's Ability To Go Beyond Private Contracts

As we stated above, proportionality is the proper test of economic impact. The burden imposed on regulated parties may be heavy, but the Connolly Court found that a large burden is not unconstitutional if the liability actually imposed is not out of proportion to the claimant's prior experience with the object of the legislation. See Connolly, 475 U.S. at 226; see also Eastern, 118 S. Ct. at 2150-51 (plurality) (discussing the justifications for imposing liability as part of the analysis of the economic impact factor). Prior experience can consist of conduct that creates reasonable expectations about the object of the legislation or conduct that creates the problems that impelled the legislature to act. Given that the situation that impelled Congress to enact the Coal Act contained elements of both, we believe that the necessary proportionality exists.

The Coal Act bridges a gap between the contractual promises of coal companies and the full extent of the funding required to provide retired miners with lifetime health benefits. The Trustees and the government argue that the companies' extracontractual acts, signalled by contractual language but going beyond that language, justify Congress's decision to bridge that gap. The

40

extracontractual acts fall into two general categories: the instability of the pre-Coal Act benefit funding structure to which the former coal companies contributed, and the expectation of lifetime benefits created by contractual language combined with the parties' consistent practices. As we have explained, we consider these reasons sufficient justification for the liability imposed by the Coal Act.

As the defendants put it, the NBCWAs made a long-term commitment to provide health-care benefits but only a short-term contractual commitment for funding.14 They argue persuasively that this arrangement would be silly, even suicidal, for the miners and the funds were it not made in the context of a belief that the industry would continue on pretty much as it had been for the past few decades. Given this, we think that Congress could reasonably conclude that it would be fair to hold the coal companies to the implicit part of their promise, because when they left the industry the explicit part lost its meaning. See ABC, Inc., 156 F.3d at 1255-57.

The Eastern plurality did not reject the Connolly principle that government may do more than require private parties to live up to their contracts:

> [C]ontracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.
>
> If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions. For the same reason, the fact that legislation disregards or

_____

14. This disposes of plaintiffs' contention that the guarantee clause of 1978 would have been superfluous if there were already a lifetime guarantee of benefits. The guarantee clause was an attempt to insure that the Trustees could live up to their obligations, an attempt that ultimately failed.

41

destroys existing contractual rights does not always transform the regulation into an illegal taking. . .. [H]ere, the United States has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose.

Connolly, 475 U.S. at 223-24 (citation omitted); see also Eastern, 118 S. Ct. at 2148 (plurality).

In Connolly, a contract limited the employers' obligations even if contributions proved insufficient to provide the promised benefits. The challenged legislation converted that defined contribution obligation to a broader defined benefit obligation. Congress enacted the law so that retirees could receive the vested benefits they had been promised and that they legitimately expected. The Court found a reasonable relation between the employers' acts and ERISA-imposed liability, even though the employers could not have foreseen a defined benefit obligation from the face of the contract. Here, the signatory operators created a benefit fund with a legal obligation to pay out more than the operators were required to pay in, just as in Connolly, and the Coal Act was Congress's attempt to close that funding gap.

The plaintiffs distinguish Connolly by arguing that the problem in that case was that companies had made broad promises that the pension funds to which they contributed would pay pensions, but only obligated themselves contractually to pay a much smaller amount to those pension funds. The plaintiffs claim that, in this case, the promises that the Funds would pay benefits were narrow, because those benefits could be reduced or eliminated at any time, and the contractual obligations were broad during the period of their existence. As we have discussed above, however, Congress decided that even though the coal companies' contractual obligations were not broad enough to sustain the Funds, their promises that the Funds would pay benefits--made as part of the BCOA-union negotiations--were broad. This is a reasonable reading of the NBCWAs, particularly given that the 1974 NBCWA removed the Trustees' discretion to change benefit levels without the bargaining parties' permission and that

42

the 1978 NBCWA began the practice of enumerating the exact health benefits to be provided. Cf. Nobel, 720 F. Supp. at 1180 (holding that benefits could not be reduced or discontinued by the Trustees despite the financial burden on the Trust).

The Coal Act extended the operators' contractual obligations to include responsibility for the expectations generated and invited by the contracts. Essentially, the Act is Congress's attempt to do equity. We agree with the court in ABC, Inc., which wrote:

> The constitutionally significant feature about these later agreements is that they made it reasonable for employers to expect a similar state-imposed duty, and thus rendered such a duty, when eventually imposed, not unfairly retroactive. That appellants could have successfully defended a breach of contract suit seeking lifetime benefits under the 1974 agreement is of no consequence.

ABC, Inc., 156 F.3d at 1258.

The plaintiffs argue that it is implausible that operators in an industry with "very high turnover of employers," Connors v. Link Coal Co., 970 F.2d 902, 903 (D.C. Cir. 1992), would have agreed to a perpetual funding obligation enforceable even against operators who left the coal industry entirely, whether for economic reasons (high labor costs, competition from other fuels, and the like) as B&T did or because they were out of coal. We agree that it is unlikely that the coal companies intended to create this exact funding structure, although modern employment relations often include post-retirement promises that may prove burdensome when conditions change for an employer. The crucial question, however, is whether the companies' actions, through the BCOA through which negotiations with the unions were conducted, created reasonable expectations about benefits and established a funding structure vulnerable to "dumping" retirees when companies left the industry. If so, Congress is not precluded from acting to redress the harms caused by this situation.