

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-24-2002

# Shenango Inc v. Comm Social Security

Precedential or Non-Precedential: Precedential

Docket No. 00-2525

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Shenango Inc v. Comm Social Security" (2002). *2002 Decisions.* Paper 604.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/604

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 24, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2525

SHENANGO INCORPORATED; STELCO USA, INC.;
STELCO COAL COMPANY; MUELLER INDUSTRIES, INC.,
    Appellants

v.

KENNETH S. APFEL, COMMISSIONER OF SOCIAL
SECURITY; MICHAEL H. HOLLAND; WILLIAM P.
HOBGOOD; MARTY D. HUDSON; THOMAS O.S. RAND;
ELLIOT A. SEGAL; CARL E. VANHORN; GAIL R.
WILENSKY, Trustees of the United Mine Worker of
America Combined Benefit Fund

On Appeal from the United States District Court
for the Western District of Pennsylvania
(Civil Action No. 99-1035)
District Judge: Hon. Robert J. Cindrich

Argued: September 19, 2001

Before: SLOVITER, NYGAARD and McKEE, Circuit Judges.

(Filed: September 24, 2002)

DAVID J. LAURENT, ESQ.
 (Argued)
Babst, Calland, Clemens and
 Zomnir, P.C.
Two Gateway Center
Pittsburgh, PA 15222
Attorney for Appellants


PETER BUSCEMI, ESQ.
 (Argued)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
JOHN R. MOONEY, ESQ.
ELIZABETH A. SAINDON, ESQ.
Mooney, Green, Gleason,
 Baker, Gibson & Saindon, P.C.
1920 L. Street, N.W., Suite 400
Washington, D.C. 20036
DAVID W. ALLEN, ESQ.
Office of the General Counsel
UMWA Health and Retirement
 Funds
2121 K. Street, N.W.

Washington, D.C. 20037
Attorneys for Appellees, Trustees
of the UMWA Combined Benefit
Funds

DAVID W. OGDEN, ESQ.
Assistant Attorney General
HARRY LITMAN, ESQ.
United States Attorney
MARK B. STERN, ESQ.
JEFFREY CLAIR, ESQ. (Argued)
Attorneys, Civil Division
Room 9536, Department of Justice
601 "D" Street, NW
Washington, D.C. 20530
Attorneys for the Federal Appellee,
Commissioner of Social Security

OPINION OF THE COURT

McKEE, Circuit Judge.

Shenango, Inc., Stelco USA, Inc., Stelco Coal Co. and
Mueller Industries (hereinafter collectively referred to as the
"Companies") challenge the Commissioner of Social
Security's assignment of responsibility for health care

2

premiums of approximately 70 retired miners and their
qualified dependents pursuant to the Coal Industry Retiree
Health Benefit Act of 1992 (the "Coal Act"), 26 U.S.C.
SS 9701-9722. The Companies argue that the Act is
unconstitutional as applied to them pursuant to Eastern
Enterprises v. Apfel, 524 U.S. 498 (1988). For the reasons
that follow, we conclude that the assignments are not
unconstitutional as applied, and that the district court did
not err in dismissing the Companies' challenge to the
assignments. However, before we explain our reason, it will
be helpful to explain the historical background and context
of this dispute.

I. THE COAL ACT

The Coal Act was enacted in 1992 "to ensure that retired
coal miners and their dependents would continue to receive
the health and death benefits they had been receiving since
the 1940s pursuant to a series of collective bargaining
agreements." Anker Energy Corp. v. Consolidation Coal Co.,
177 F.3d 161, 163-64 (3d Cir. 1999). Because the origins
and history of the Coal Act are set forth in great detail in
the Supreme Court's opinion in Eastern Enterprises, as well
as in our opinions in Unity Real Estate v. Hudson, 178 F.3d
649 (3d. Cir. 1999), and Anker Energy, we need not repeat
it here. Rather, we offer the following narrative from our
opinion in Anker Energy as background for our analysis:

    In 1947, the United Mine Workers of America
    ("UMWA") and the Bituminous Coal Operators'

Association ("BCOA") agreed upon the first of a series of National Bituminous Coal Wage Agreements ("NBCWA" or "wage agreement"), which specified the terms and conditions of employment and provided health and pension benefits for miners. The 1947 NBCWA established the United Mine Workers of America Welfare and Retirement Fund [W&R Fund], which used the proceeds of a royalty on coal production to provide pension and medical benefits for miners and their families. The 1947 NBCWA did not specify the benefits to which miners and their families were entitled, instead leaving this task to three trustees in charge of the Fund. In 1950 the union and the industry

association agreed upon a new NBCWA that created a new Fund financed by a per ton levy on coal mined by signatory operators. Like the 1947 Fund, the 1950 version did not promise specific benefits, and the benefits were always subject to cancellation or change.

This system did not change significantly until 1974 when, to comply with the newly enacted [Employee Retirement Income Security Act], the UMWA and the BCOA negotiated a new wage agreement that created four trusts funded by royalties on coal production and premiums based on hours worked by miners. Under the new agreement, the 1950 Benefit Plan covered miners who retired before January 1, 1976, and their dependents, while the 1974 Benefit Plan covered miners who retired after 1975 and their dependents. Both Plans provided nonpension benefits, including medical benefits.

The 1974 NBCWA explained that it was amending the previous system to provide health benefits for retired miners "for life," and to their widows until death or remarriage. Because of this broadened coverage the number of eligible benefit recipients increased dramatically, and the Plans began losing money.

In response, the 1978 NBCWA assigned responsibility to signatory employers for the health care of their own active and retired employees. The 1978 agreement also restricted the 1974 Plan so that it would provide health benefits only for "orphaned" retirees, those whose last employer had gone out of business or otherwise ceased contributing to the Plans. To ensure the Plans' solvency, the 1978 NBCWA included a "guarantee" clause that obligated signatories to make sufficient contributions to maintain benefits during that agreement, and the union and operators amended the Plans to include "evergreen clauses" that required signatories to contribute to the Plans if they remained in the coal business even if they never signed another wage agreement.

Despite the 1978 NBCWA and subsequent attempts

to improve the Plans, they continued to lose money

because of the increase in beneficiaries, the escalating costs of health care, and the flood of signatory companies abandoning the Plans. In 1992 Congress responded by passing the Coal Act.

177 F.3d at 164-165.

In enacting the Coal Act, Congress declared that the Act was intended to remedy problems with funding retiree health benefits in the coal industry, to allow for sufficient operating assets for the health benefit plans, and to provide for the continuation of a privately funded and self-sufficient program for the delivery of health care benefits to retired miners and their dependents. Pub.L. No. 102-486, S 19142(b), 106 Stat. 3036, 3037 (1992), 26 U.S.C. S 9701 note. Accordingly, the Act required certain benefit plans previously established under the UMWA collective bargaining agreements to be merged into a new plan-- the United Mine Workers of America Combined Benefit Fund.1 26 U.S.C. S 9702(a). The Combined Fund provides health and death benefits to retired coal miners and dependents who, as of July 20, 1992, were eligible to receive, and were receiving, benefits under the UMWA 1950 or 1974 benefit plans. 26 U.S.C. SS 9703(a), (b)(1), (c), (e) & (f). Benefits paid through the Combined Fund are funded in part by premiums imposed on "signatory coal operators," i.e., certain coal operators that employed an eligible beneficiary and had signed a collective bargaining agreement between the UMWA and BCOA, a multiemployer group of coal producers, or other "related persons" connected to the

_____

1. The Combined Fund is one of three components formulated by Congress to achieve the purposes of the Coal Act. The second component is the mandated continuation of individual employer health plans maintained by signatories to the 1978 and later NBCWAs. 26 U.S.C. S 9711. The third component is the 1992 Plan which provides benefits for persons who, but for the enactment of the Coal Act, would have been eligible to receive benefits from the UMWA 1950 or 1974 benefit plans, but who are not eligible for benefits from the Combined Fund. It also provides benefits for persons who are entitled to receive benefits directly from their former employers but who do not in fact receive such benefits. 26 U.S.C. S 9712. The second and third components are not implicated in this appeal. We are only concerned with the Combined Fund.

signatory operator by common ownership or control. See 26 U.S.C. SS 9701(c)(1) & (c)(2), 9704, 9706.

The Act directs the Commissioner of Social Security 2 to assign each individual beneficiary to one of these signatory coal operators or its "related person." The assignment is determined by the length of the beneficiary's service, the

date of service, and whether the employer signed national collective bargaining agreements with the UMWA in 1978 or later. 26 U.S.C. S 9706(a). The Act establishes a three tier mechanism for making assignments that we have described as the "linchpin" of the Coal Act's statutory scheme. Unity Real Estate Co. v. Hudson, 178 F.3d at 654. The Act provides in relevant part:

> (a) In general.--For purposes of this chapter, the Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:

> (1) First, to the signatory operator which--

> (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

> (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

> (2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which--

> (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

---

2. Originally, the Coal Act provided that the Secretary of Health and Human Services would be responsible for the assignment of Combined Fund beneficiaries. The Secretary delegated this task to the Commissioner of Social Security. In 1994, Congress transferred the statutory responsibility directly to the Commissioner. See Social Security Independence and Program Improvements Act of 1994, Pub.L.No. 10-3-296, SS 105(a)(2)(A), 108(h)(9)(A), 108 Stat. 1472, 1487-88 (1994).

6

> (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

> (3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

26 U.S.C. S 9706(a)(1), (2) & (3). Once the Commissioner makes the assignment under S 9706, the assignee must then pay the annual premiums to the Combined Fund based on the amounts required to provide health and death benefits for the assigned beneficiaries.

If a miner or his[3] dependents cannot be assigned under this scheme, his benefits are funded by either asset transfers from one of the Combined Fund's predecessor benefit plans, see 26 U.S.C. S 9705(a)), transfers from the U.S. Treasury's Abandoned Mine Land Reclamation Fund, see 26 U.S.C. S 9705(b), 30 U.S.C. S 1232(h); or, if those sources are insufficient or unavailable, an additional unassigned -- or "orphaned" -- retiree premium that the Act imposed on all signatory operators. See 26 U.S.C. SS 9704(d), 9705(a)(3)(B), 9705(b)(2).

The Coal Act also contains several provisions that, taken together, treat a commonly controlled group of related corporations as a single employer for purposes of liability under the statute. Pursuant to those provisions, the original employer and a wide range of affiliated companies or successors are potentially liable for premiums on miners' benefits under the Act. The Commissioner can assign responsibility for paying premiums for a miner's benefits either to a mine operator that actually employed an eligible beneficiary and signed a collective bargaining agreement between the UMWA and the BCOA ("signatory operator"), or to any "related person." 26 U.S.C. S 9706(a). The Act defines

_____

3. Inasmuch as it is highly unlikely that any women were employed as miners during the relevant period, we will use the masculine pronouns in referring to all miners.

"related person" to include all members of a commonly controlled group of corporations including the signatory, other businesses under common control with the signatory, and subsequent successors in interest to any of those affiliated entities. 26 U.S.C. S 9701(c)(2)(A)). A "controlled group" is in turn defined as a group of companies in which a common parent or concentration of individual economic interests owns or controls more than 50% of each of the affiliated companies. See 26 U.S.C. S 9701(c)(2)(A), incorporating by reference 26 U.S.C. S 52(a) & (b), which in turn incorporates by reference 26 U.S.C. S 15563(a). The determination of which entities are "related persons" under the Coal Act turns on an entity's status with regard to the miner or the miner's employer as of July 20, 1992. 26 U.S.C. S 9701(c)(2)(B).

"Related persons" have broad and shared responsibility for premiums. Under the Act, any company within the commonly controlled group may be treated as having employed a related signatory's miners. 26 U.S.C.S 9706(b). In addition, related persons are "jointly and severally liable for any premium required to be paid" by its affiliated signatory operator. 26 U.S.C. S 9704(a). Congress instructed the Commissioner to promptly assign miners to various companies according to this three tiered scheme promptly after the Coat Act's 1992 enactment. The statute states: "For purposes of this chapter, the Commissioner of

Social Security shall, before October 1, 1993, assign each
coal industry retiree who is an eligible beneficiary to a
signatory operator . . . ." 26 U.S.C. S 9706(a).

## II. THE COMMISSIONER'S ORIGINAL ASSIGNMENTS

The Companies were collectively assigned responsibility
for premiums for approximately 70 miners and qualifying
dependents pursuant to the third tier of the assignment
scheme. 26 U.S.C. S 9706(a)(3). The Companies did not
employ any of the miners thus assigned. Rather, the
Commissioner assigned the miners based upon the
Companies' relationships to other entities that had
employed the miners.4

---

4. The exact relationship between each plaintiff and its related entities is
as follows:

The Commissioner originally assigned liability on the
grounds that the Companies were "related" to a now-
defunct employer that had signed a pre-1974 NBCWA.
Specifically, Mueller was assigned liability with respect to
employees of Joanne Coal because Joanne Coal signed a
1964 wage agreement. Then, Joanne Coal merged with
Sharon Steel which subsequently merged with Mueller.
Shenango received assignments with respect to employees
of Lucerne Coke, an employer that signed a 1971 wage
agreement and later merged with Shenango. Stelco USA
and Stelco Coal received assignments with respect to
employees of Mather Colliers because Mather signed a 1959
wage agreement. Stelco Coal mined coal under the name of
"Mather". Stelco USA and Stelco Coal are commonly owned.

The Commissioner's assignments to Stelco Coal and
Shenango were made before October 1, 1993. The
assignments to Mueller Industries, Inc., were made
sometime after that date.

The Companies concede that they are "related persons"
as defined in the Act, 26 U.S.C. S 9701(c)(2)(A). They

---

Shenango merged with Lucerne Coke Co. sometime after 1971.
Lucerne last signed an NBCWA in 1971. That agreement expired in
November, 1974. Lucerne employed the miners assigned to Shenango,
but Lucerne is no longer in business. However, as of July 20, 1992,
Shenango was related, via its parent company, to Aloe Coal Co. which
signed NBCWAs in 1974 and later.

Stelco Coal Co. mined coal under the name of Mather Collieries, which
permanently ceased operating sometime before 1964. Stelco USA, Inc., is
commonly owned with Stelco Coal Co. Mather signed several NBCWAs.
It signed the last one in 1959. Mather employed the miners assigned to
Stelco Coal and Stelco USA. As of July 20, 1992, Stelco Coal and Stelco
USA were related to Pikeville Coal Company, which signed the 1974 and
subsequent NBCWAs.

In December, 1980, Mueller Industries, Inc., merged with Sharon Steel Corp., Sharon had previously merged with Joanne Coal Co., and Joanne Coal continued mining until approximately 1969. Joanne Coal last signed a NBCWA in 1964. Joanne Coal employed the miners assigned to Mueller. As of July 20, 1992, Mueller was related to Carpentertown Coal & Coke Co., and to United States Fuel Co. Carpentertown Coal signed the 1978 NBCWA and later NBCWAs.

concede that they are related to the coal companies that actually employed the miners assigned to the Companies, signed pre-1974 NBCWAs and that are now out of business. They also concede that they are related to the coal companies that employed an entirely different set of miners and that signed post-1974 NBCWAs. The Companies differentiate between these two groups by referring to them as "Pre-1974 Signatories" and "Post-1974 Signatories."

III. EASTERN ENTERPRISES AND THE COMMISSIONER'S RESPONSE

As is often the case under the Coal Act, the challenge to the Commissioner's assignments here rests in large part upon our interpretation of Eastern Enterprises . The Court there considered the constitutionality of the Coal Act as applied to Eastern. That company had mined coal until 1965, and signed every NBCWA from 1947 until 1964. The Commissioner assigned Eastern liability for over 1000 miners pursuant to 26 U.S.C. S 9706(a)(3), based upon Eastern's status as the pre-1978 signatory operator for whom the miners had worked the longest. The total liability for those assignments was estimated to be between $50 and $100 million. Eastern sued claiming that S 9706(a)(3) was unconstitutional as applied to it because the Act's imposition of liability violated the Due Process and Takings Clauses of the Fifth Amendment.

A four-justice plurality of the Supreme Court agreed that the Act violated the Takings Clause as applied to Eastern Enterprises. Eastern Enterprises, 524 U.S. at 537. While recognizing that a takings analysis is "essentially ad hoc and fact intensive," the plurality nonetheless identified three factors that are usually significant to assessing a Takings challenge under the Fifth Amendment: "the economic impact of the regulation, its interference with investment backed expectations, and the character of the governmental action." Id. at 523-524 (quoting Kaiser Aetna v. United States, 444 U.S. 164, 175 (1979)). The plurality then reviewed cases involving legislative schemes similar to the Coal Act; viz., the Black Lung Benefits Act and the Multiemployer Pension Plan Amendments Act ("MPPAA")

which was enacted to supplement the Employee Retirement

Income Security Act ("ERISA"). The justices concluded that those cases established:

> Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties. Congress may also impose retroactive liability to some degree, particularly where it is confined to short and limited periods required by the practicalities of producing national legislation. Our decisions, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience.

Id. at 528-529 (citation and internal quotations omitted) (emphasis added).

Applying these principles to Eastern Enterprises, the plurality first focused on the economic impact of the Act and found that it placed a "considerable financial burden" on that company. Id. at 529. The financial burden was not a "permanent physical occupation of Eastern's property of the kind [usually] viewed as a per se taking[.]" However, the plurality noted that the Court's decisions upholding the MPPAA "suggest that an employer's statutory liability for multiemployer pension plans should reflect some proportionality to its experience with the plan." Id. at 530 (citation and internal quotations omitted). The plurality concluded that this proportionality was lacking insofar as the Coal Act was applied to Eastern. Eastern had contributed to the 1947 and 1950 W&R Funds, but "it [had] ceased it coal mining operations in 1965 and neither participated in negotiations nor agreed to make contributions in connection with the 1974, 1978, or subsequent NBCWAs." Id. This was significant because those latter agreements were the "first [to] suggest an industry commitment to funding lifetime health benefits for both retirees and their family members." Id . Thus, because Eastern had neither contemplated liability for lifetime benefits to miners nor contributed to the miners' expectations of lifetime benefits, the plurality found that

11

"the correlation between Eastern and its liability to the Combined Fund is tenuous, and the amount assessed against Eastern resembles a calculation made in a vacuum." Id. at 531 (citation and internal quotations omitted).

The assignments to Eastern faired no better when the plurality considered the second and third factors it had culled from the Court's Takings Clause jurisprudence. The Act's "substantial and particularly far reaching" retroactivity[5] interfered with Eastern's reasonable investment backed expectations. Id. at 534. The plurality reasoned that a coal industry employer could not have contemplated liability for

lifetime benefits to miners until those provisions were included in the 1974 NBCWA. Therefore, "the Coal Act's scheme for allocation of Combined Fund premiums[was] not calibrated either to Eastern's past actions or to any agreement -- implicit or otherwise -- by the company." Id. at 536. Finally, the plurality found that the "nature of governmental action . . . is quite unusual," and"implicates fundamental principles of fairness underlying the Takings Clause," because it "singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused." Id. at 537.

Inasmuch as each of the three factors weighed against sustaining the "taking," the plurality concluded that the assignment to Eastern under the Act was unconstitutional.

Justice Kennedy, who provided the fifth vote striking down the application of the Act as to Eastern, disagreed with the plurality's analysis, but found that the Act's retroactivity violated due process. Id. at 539-50. He applied an "arbitrary and irrational" standard of review, Id. at 547,

_____

5. Coal Act assignments operate retroactively because they require an assignee to use current funds to provide benefits for miners after the assignee believed its liability to the miners had been settled. See Eastern Enterprises, at 534 (O'Connor, J.) ("[T]he Coal Act operates retroactively, divesting Eastern of property long after the company believed its liabilities under the 1950 W&R Fund to have been settled.").

12

and focused on the fact that Eastern Enterprises had not signed a 1974 or later NBCWA. He concluded:

> Eastern was once in the coal business and employed
> many of the beneficiaries, but it was not responsible
> for their expectation of lifetime benefits or for the
> perilous condition of the 1950 and 1974 plans which
> put the benefits in jeopardy. As the plurality discusses
> in detail, the expectation was created by promises and
> agreements made long after Eastern left the coal
> business. Eastern was not responsible for the resulting
> chaos in the funding mechanism caused by other coal
> companies leaving the framework of the National
> Bituminous Coal Wage Agreement. This case is far
> outside the bounds of retroactivity permissible under our
> law.

Id. at 550 (emphasis added).

The four dissenting justices agreed with Justice Kennedy that the application of the Act did not violate the Takings Clause, but disagreed with his view that the Act violated due process. Id. at 556-67.

We have previously noted the "splintered nature" of the

Court's decision, and remarked that it is "difficult to distill a guiding principle from Eastern." Unity Real Estate Co., 178 F.3d at 658. However, as recited above, both the plurality and Justice Kennedy focused on one fact which each considered significant. The 1974, 1978 and subsequent NBCWAs were the first wage agreements containing a commitment to fund lifetime health benefits for retired miners and their dependents. Eastern Enterprises had not signed either the 1974 or the 1978 NBCWAs. Therefore, it could not have contemplated contributing to the miners' expectation of lifetime health benefits. See Anker Energy Corp. v. Consolidation Coal Co., 177 F.3d at 172 ("[A]nalysis of the decisions in Eastern Enterprises leads us to the conclusion that a majority of the Court would find the Act unconstitutional when applied to an employer that did not agree to the 1974 or subsequent NBCWAs, while application of the Act to a signatory to the 1974 or subsequent wage agreement would be an entirely different matter."); see also, Association of Bituminous

13

Contractors, Inc. v. Apfel, 156 F.3d 1246, 1257 (D. C. Cir. 1998)("The clear implication of each opinion in Eastern Enterprises is that employer participation in the 1974 and 1978 agreements represents a sufficient amount of past conduct to justify the retroactive imposition of Coal Act liability (for the dissenting justices, of course, such participation is not even necessary")).

After Eastern Enterprises, the Commissioner undertook a comprehensive review of all assignments that had previously been made under S 9706(a)(3), including those made to the Companies. The Commissioner reasoned that, under Eastern Enterprises, if neither the original employer nor related persons had signed the 1974 or later NBCWAs, the assignment could not be distinguished from Eastern Enterprises. Accordingly, the Commissioner, on his own initiative, voided hundreds of assignments that were based solely on an employer or related person's participation in a pre-1974 NBCWA.

However, the Commissioner also concluded that Eastern Enterprises allowed miners to be assigned to coal companies that where part of a controlled group of corporations that included entities that had signed post-1974 NBCWAs. These assignments were deemed to be materially different from the assignments in Eastern Enterprises. The plaintiff in Eastern was not statutorily related to another company that had signed 1974 and later NBCWAs. The Commissioner therefore concluded that Eastern did not address circumstances in which the assignee is related to both the original employer and another, affiliated company that signed collective bargaining agreements promising lifetime care. Accordingly, the Commissioner rejected the Companies' requests to vacate their assignments of the miners employed by the Pre-1974 Signatories.

IV. DISTRICT COURT PROCEEDINGS

On June 30, 1999, the Companies filed a five Count complaint against the Commissioner and the Trustees of the Combined Fund. In Count I, the Companies alleged that the Commissioner's refusal to vacate the Coal Act

assignments of liability for miners employed by the Pre-1974 Signatories was unlawful under Eastern Enterprises. In Counts II and III, the Companies alleged that the Coal Act violates the Takings and Due Process Clauses of the Fifth Amendment as it applies to them. In Count IV, the Companies challenged the Commissioner's authority to make any assignments after September 30, 1993. In Count V, the Companies argued that because the Commissioner's assignments should be vacated for the reasons stated in the preceding four Counts, the Combined Fund is obligated to return all premium payments together with interest.

After engaging in an excellent and well-reasoned analysis, the district court granted the Commissioner's motion to dismiss Counts I through IV. Thereafter, the parties submitted their Joint Statement of Position informing the district court that the parties agreed that, given its dismissal of Counts I through IV, Count V was moot. Accordingly, the district court dismissed Count V as moot, and this appeal followed.6

V. DISCUSSION

The Companies assert two basic arguments. First, they argue that their position is essentially identical to the position of the plaintiff in Eastern Enterprises insofar as the Pre-1974 Signatories are concerned. The Companies claim that the Commissioner therefore violated the Due Process Clause in assigning them miners employed by the Pre-1974 Signatories. Second, they argue that the Commissioner exceeded his authority under S 9706(a) because he made some assignments after October 1,1993; the "cutoff" that Congress mandated in the Act. We will address each argument separately.

_____

6. We review de novo the district court's decision as to the constitutionality of the Coal Act as applied to the Companies. Anker Energy Co. v. Consolidation Coal Co., 177 F.3d at 169. Although the district court granted the Commissioner's motion to dismiss under Fed. R. Civ. P. 12(b)(6), the parties apparently submitted documents outside the pleadings themselves; therefore the appropriate standard of review is the same as that for a motion for summary judgment, i.e., plenary review. Smith v. Johns-Manville Corp., 795 F.2d 301, 306 (3d Cir. 1986).

A. Are the Companies in a Substantially Identical Position to Eastern Enterprises?

As noted earlier, no single rationale emerges from the decision in Eastern Enterprises. Accordingly, " 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.' " Marks v. United States, 430 U.S. 188, 193 (1977)(quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976)). The Marks rule is only applicable where "one opinion can be meaningfully regarded as 'narrower' than another" and can "represent a common denominator of the Court's reasoning." Rappa v. New Castle County, 18 F.3d 1043, 1057 (3d Cir. 1994)(quoting King v. Palmer , 950 F.2d 771, 781 (D.C. Cir. 1991)(en banc). "[W]here approaches differ, no particular standard is binding on an inferior court because none has received the support of a majority of the Supreme Court." Anker Energy Corp., at 170 (citing Rappa v. New Castle County, 18 F.3d at 1058).

In Unity Real Estate, we stated that "Justice Kennedy's substantive due process reasoning is not a 'narrower' ground that we might take to constitute the controlling holding." 178 F.3d at 658. Consequently, the only binding aspect of the fragmented decision in Eastern Enterprises is its "specific result," i.e., the Act is unconstitutional as applied to Eastern Enterprises. Anker Energy Corp., at 170 (citing Association of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1255 (D.C. Cir. 1998)). Or, as we said in Unity Real Estate: "Eastern . . . mandates judgment for the plaintiffs only if they stand in a substantially identical position to Eastern Enterprises with respect to both the plurality and Justice Kennedy's concurrence." 7 178 F.3d at 659.

Earlier, we noted that the Companies concede that under the Coal Act, they are "related persons" to two sets of entities, which they call the "Pre-1974 Signatories" and the "Post-1974 Signatories." Because of their"related person"

_____

7. We also held in Unity Real Estate that because of the concurrence and dissent in Eastern Enterprises, "we are bound to follow the five-four vote against the takings claim. . . ." 178 F.3d at 659; see also Anker Energy Corp., at 170 n.3.

16

status to the Post-1974 Signatories, the Companies were assigned premium liability for miners employed by the Pre-1974 Signatories.

The Companies concede that any assignments of Coal Act liability based on their status of being related persons to Post-1974 Signatories are constitutionally valid. Companies' Br. at 8. However, the Companies argue that they"stand in a substantially identical position to Eastern [regarding the pre-1974 Signatories] because, as in Eastern , all of the disputed miners worked for signatory operators who last signed [NBCWAs] before 1974." Id. at 9. In the Companies' view, the Pre-1974 Signatories and the Post-1974

Signatories are two discrete sets of entities that must be viewed differently under Eastern Enterprises. Therefore, according to the Companies, the constitutionality of the Coal Act as applied to any particular member of a controlled group of corporations depends upon whether the particular member signed a 1974 or later NBCWA, not upon whether any other member of the group did so. The Companies rely upon our decision in Unity Real Estate in claiming that their substantial identity to the Pre-1974 Signatories places them (the Companies) in the shoes of Eastern Enterprises, and the Commissioner's assignments of the miners employed by the Pre-1974 Signatories was therefore unconstitutional as to them.

The Companies make no other constitutional challenge to the assignments regarding the Pre-1974 Signatories. Therefore, their "as applied" constitutional challenge turns on whether they are in a "substantially identical position to Eastern Enterprises" with regard to assignments of the Pre-1974 Signatories. We hold that the circumstances here are not substantially equivalent to the circumstances in Eastern Enterprises, and the Commissioner's assignment of the Pre-1974 Signatories was therefore not a violation of the Fifth Amendment. A closer examination of Eastern Enterprises shows why.

Eastern Enterprises began operations in 1929 and it mined coal in West Virginia and Pennsylvania until 1965. Eastern, 524 U.S. at 516. In that capacity, it was a signatory to each NBCWA executed between 1947 and 1964 and made contributions of over $60 million to the 1947 and

17

1950 welfare and retirement funds. Id. In 1963, Eastern decided to spin-off its coal operations to a subsidiary, Eastern Associated Coal Corp. ("EACC"). Id. The spin-off was completed by 1965, but Eastern retained its stock interest in EACC through a subsidiary corporation, Coal Properties Corp. ("CPC") until 1987, and it received dividends of more than $100 million from EACC during that period. Id.

After 1965, Eastern ceased coal mining operations and was not a signatory to the 1974 NBCWA, (which, as noted, was the first wage agreement to suggest an industry-wide commitment to funding lifetime health benefits to miners and their dependents), or to any subsequent NBCWAs. Id. at 530. EACC signed the 1974 NBCWA as well as subsequent ones. However, in 1987, Eastern sold its interest in CPC to Peabody Holding Co., Inc. Id . at 516. As a consequence of that sale to that unrelated, third party, Eastern had divested itself of all of its interests in its EACC subsidiary five years before the enactment of the Coal Act.

After the enactment of the Coal Act, the Commissioner assigned Eastern the obligation for Combined Fund premiums for over 1,000 retired miners who had worked for Eastern before 1966, based on Eastern's status as the pre-

1978 signatory operator for whom the miners had worked the longest as prescribed by S 9706(a)(3). Id. at 517. Eastern was not assigned responsibility for any miners who had been employed by EACC. Id. at 530.

From this recitation of the facts in Eastern, it is obvious that the Companies are not in a "substantially identical position to Eastern." Eastern was assigned premium liability under the Coal Act solely because it employed the assigned miners. Inasmuch as Eastern never signed a wage agreement committing to lifetime health benefits, it could not be charged with the cost of furnishing those benefits. See Id. at 531 ("The company's obligations under the Act depend solely on its roster of employees some 30 to 50 years before the statute's enactment, without any regard to responsibilities that Eastern accepted under any benefit plan the company itself adopted."). Eastern did not involve liability under the Coal Act's "related person" provisions. In contrast, the Companies' liability here arises from their

18

relationship to "related person" subsidiaries that signed a NBCWA in 1974 or thereafter. The Commissioner concluded that the nexus between the Companies and those related parties was sufficient to assign liability for miners' lifetime benefits even though none of the Companies signed a wage agreement obligating them to do so.

The Companies attempt to find shelter under the umbrella of Eastern Enterprises by stressing that Eastern also had a subsidiary, EACC, that signed a post-1974 NBCWA, and arguing that Eastern's relationship with EACC was not sufficient to sustain the Commissioner's assignments of Coal Act liability to Eastern. Companies' Br. at 15-16. However, that argument ignores a critical distinction. Eastern divested itself of EACC in 1987, five years before the enactment of the Coal Act. The Coal Act provides that where ostensibly related companies remain in business, the question of whether they are "related persons" within the meaning of the statute is determined with respect to their relationship as of a date shortly before the Act's enactment -- July 20, 1992. 26 U.S.C. S 9701(c)(2)(B). Because Eastern sold EACC before that date, EACC was not a "related person" to Eastern under the Act. Therefore, premium liability could not have been imposed on Eastern as a related person to EACC.

We have twice before held that liability based upon the Act's related person provisions removes an assignee from the shelter of Eastern Enterprises. In Unity, we upheld the constitutionality of the Coal Act as applied to a company that was a related person to both a pre-1974 NBCWA signatory and a post-1974 signatory. At the time the Commissioner made the premium assignments, Unity Real Estate Company was a small corporation closely-held by members of the Jamison family. Unity owned only a small commercial building and a parking lot. It never mined coal and never signed a coal wage agreement. Nonetheless, the

assignments to it were valid under the Coal Act because it was a related person to several, defunct coal mining companies that ultimately merged into Unity. Among those companies were South Union-PA and South Union-WVA. South Union-PA had mined coal since 1923 and signed NBCWAs from 1947 through 1961. South Union-WVA

began mining coal when South Union-PA stopped and it signed the 1974, 1978 and 1981 NBCWAs.8

The Commissioner assigned Combined Fund premium liability to Unity for the miners formerly employed by all of Unity's related person entities pursuant to SS 9706(a)(1) & (2), and Unity challenged the assignment relying on Eastern. After a comprehensive analysis of the various opinions in Eastern, we upheld the Coal Act as applied to Unity and sustained all of the assignments, including assignments of those miners who had worked for South Union-PA. As noted earlier, South Union-PA had not signed a NBCWA in 1974 or thereafter. The critical distinction between Unity/the Jamison family and Eastern Enterprises was that Eastern never signed a 1974 or subsequent NBCWA and was not a related person to any entity that had. Unity, however was tethered to the commitment of lifetime benefits through South Union-WVA, its related person. That coal company had made such a commitment in the 1974, 1978 and 1981 NBCWAs. In affirming Unity's liability we stated:

> [b]ecause the plaintiffs signed NBCWAs in 1974 and thereafter, they are factually distinguishable from Eastern Enterprises. Language in the plurality and the concurrence suggesting that expectations fundamentally changed after 1974 support our conclusions.

178 F.3d at 659. That distinction "compell[ed] the conclusion that Eastern is not on all fours with the case before us." Id.

Similarly, in Anker we upheld the Act's application to Anker coal via a related person that was a post-1974 signatory operator. We held that Anker's related person had agreed to the terms of the 1974, 1978, 1981 and 1984 NBCWAs and that "factually distinguish[ed] Anker's situation from that of Eastern Enterprises and compell[ed] a finding that the Act [was] constitutional[as applied to Anker]." 177 F.3d at 172. There, from 1967 until 1982, Consolidation Coal had contracted with King Knob Coal for

---

8. A bankruptcy court granted it leave to reject the 1981 NBCWA.

King Knob to mine coal on Consolidation's property. As part

of this arrangement, King Knob agreed that its employees would be UMWA members and that it would be a signatory to the then current NBCWAs. To achieve that end, King Knob signed "me too" agreements in 1974, 1978, 1981 and 1984.[9]

An affiliate of Anker acquired King Knob in 1975 and the relationship between Consolidation and King Knob continued until Consolidation canceled its contract with King Knob in 1982. In 1994 and 1995, the Commissioner informed Anker that it was a related person to King Knob and assigned premium liability to Anker for King Knob's retired miners. Anker sued alleging that under Eastern Enterprises the Commissioner's assignments were unconstitutional as applied to it.

Relying on Unity, we upheld the assignment. We concluded that Anker's related person had agreed to be bound by the terms of the post-1974 NBCWA's. Accordingly, Anker's situation "[fell] outside the specific holding of Eastern Enterprises." Id . at 172.

Here, not to be deterred by the wealth of precedent (seemingly on point) against them, the Companies press on and argue that Unity imposes a limitation on related person liability that precludes consideration of the bargaining history of any company other than the assigned miners' actual employer. They argue that because the assignments in Unity were made pursuant to SS 9706(a)(1) and (2), Unity was treated as if it stood in the shoes of the signatory operators who employed the miners and who had signed all of the NBCWAs through 1978. Therefore, the Companies claim that Unity requires that we treat them as if they too

_____

9. A "me too" agreement is an agreement between an employer who is not a member of the BCOA but who agrees with the UMWA to be bound by the terms of the NBCWA. Anker, 177 F.3d at 166-7. A "me too" agreement has terms identical to the terms of the respective NBCWA. There is no legal distinction between the NBCWA itself, and the corresponding "me too" agreement insofar as the employer's rights and obligations are concerned. Id. at 172 n.4. Thus, the "distinction" between a NBCWA signatory and a "me too" signatory is not a difference for purposes of our Coal Act analysis. Id.

stand in the shoes of the signatory operators who employed the assigned miners. Based upon their insistence that they stand in the shoes of the Pre-1974 Signatories who actually employed the assigned miners, the Companies claim that premium liability assignments are unconstitutional as applied under Eastern Enterprises because the Pre-1974 Signatories neither committed to paying lifetime benefits, nor contributed to any such expectation on the part of the assigned miners.

However, this argument is based upon a misreading of Unity. Unity was not treated as if it stood in the shoes of a

signatory operator who signed a post-1974 NBCWA. Unity was treated as a "related person" to pre-1974 signatories and at least one post-1974 signatory and it was assigned liability for miners who had worked for pre-1974 signatories because of that "related person" status. The Companies are in exactly the same position here.

The Companies also argue that because the assignments were made pursuant to 9706(a)(3), the fact that they have related persons who signed 1974 and later NBCWAs is irrelevant because only the bargaining history of the Pre-1974 Signatories can be considered in determining the constitutionality of the assignments. This argument also allows them to again claim to stand in the shoes of Eastern Enterprises. It is based upon a document in the record signed by a man named "Ray Worley." Worley writes:

> The Coal Act does not permit us to impute a related company's signatory status to that of a signatory operator; that is, a pre-1978 signatory cannot be treated as a 1978 (or later) signatory simply because its parent or "sister" company is a 1978 (or later) signatory.

App. at 178. In the Companies' view, the Commissioner and the Combined Fund Trustees have violated this "policy" because they claim that the Commissioner's and the Combined Fund Trustees' theory that they are liable for the premiums of the miners employed by the Pre-1974 Signatories effectively treats the Pre-1974 Signatories as if they were Post-1974 Signatories. That is, they have imputed the signatory status of the Post-1974 Signatories

22

to the Pre-1974 Signatories. Moreover, the Companies argue this "imputation of signatory status" theory suggests that the assignments originally made were improper. In the Companies' view, all miners who have been assigned under S 9706(a)(3), should have been assigned, or should be reassigned, under either SS 9706(a)(1) or (2) if the pre-1978 operator who employed them had a related person who signed a 1978 or later NBCWA.

We disagree. In the first place, the Companies have never claimed that the original assignments of the miners employed by the Pre-1974 Signatories were incorrect under the S 9706(a) statutory assignment scheme. 10 Second, we reject the Companies' claim that Worley's memo is an admission by the Commissioner that the signatory status of one related person cannot be imputed to another. Reply Br. at 10. The Companies do not identify Worley's position with the Social Security Administration, they do not claim that Worley was speaking for the Commissioner and they do not tell us the purpose of Worley's memo. Third, and perhaps most importantly, Worley's memo appears to speak to the original assignment of beneficiaries procedures under S 9706(a). It does not appear to have anything to do with the related person provisions of the Act.11 Accordingly, the

Companies' "obligations must stand or fall regardless of
how [it] was assigned the beneficiaries." Unity, at 655 n.2.

Our rejection of the Companies' attempt to analogize
their circumstances to the facts in Eastern Enterprises does

_____

10. The Coal Act provides that if an assigned operator believes that
beneficiaries have erroneously been assigned to it, the operator can
obtain information about the beneficiaries from the Commissioner and
seek review of the assignments. 20 C.F.R. S 9706(f); see also 20 C.F.R.
SS 422.601-607. The burden is on the assigned operator to make out a
prima facie case that the assignments were in error. See 20 C.F.R.
S 422.605. If the Commissioner finds that the assignments were in error,
he or she can declare them void and reassign the beneficiaries to the
appropriate signatory operator or related person. 26 U.S.C.
S 9706(f)(3)(A). If the Commissioner finds that the assignments are not in
error, he or she must notify the assigned operator. The Commissioner's
determination is final. 26 U.S.C. S 9706(f)(3)(B).

11. As we noted at the outset, the Companies are not challenging the
constitutionality of the related person provisions.

23

not end our inquiry. In Eastern, the plurality also noted
that the Court's prior decisions

        have left open the possibility that legislation might be
        unconstitutional if it imposes severe retroactive liability
        on a limited class of parties that could not have
        anticipated the liability, and the extent of that liability
        is substantially disproportionate to the parties'
        experience.

Eastern, at 528-529 (O'Connor, J.). In recognition of that
possibility, and the possibility that "Eastern embodies
principles capable of broader application," we required an
additional level of substantive due process analysis to
determine if the assignments to the Companies are
constitutional as applied in Unity.12 178 F.3d at 659. That
additional level of analysis measures "the extent of the gap
between the coal companies' contractual promises to the
Funds and the requirements of the Coal Act." Id.

In Unity, we stated that the standard of review when a
due process violation is alleged "is forgiving; it bars only
arbitrary and irrational congressional action." Id. In Unity
we began our analysis with an extensive review of the
available evidence. We noted that Congress' findings in
enacting the Coal Act that the coal industry had created a
reasonable expectation that miners would have lifetime
benefits, and that the coal companies were responsible for
the deterioration of miners' Benefit Plans, were"reasonable
evaluations of the problem." Id. at 670.

We next concluded that the Act's retroactivity did not
mean that the legislation was irrational or a violation of due
process. Id. In reaching that conclusion we recognized that

"[t]he heart of retroactivity analysis is an evaluation of the extent of the burden imposed by a retroactive law in

_____

12. While the Eastern Enterprise plurality's cautionary note that legislation might be unconstitutional if it is severely retroactive and substantially disproportionate was made in the course of its Taking Clause analysis, the admonition is applicable to a substantive due process analysis because, as the plurality noted,"[o]ur analysis of legislation under the Takings and Due Process Clauses is correlated to some extent." 524 U.S. at 537 (plurality) (citing Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 223 (1986)).

24

relation to the burdened parties' prior acts[.]" We held that "[w]here Congress acts reasonably to redress an injury caused or to enforce an expectation created by a party, it can do so retroactively." Id. at 670, 671. In Unity, the period between the coal company's contractual undertaking to pay for benefits to the date of the passing of the Coal Act was eleven years. Id. at 670.13  Although that period was "quite long," we concluded that it was "not so extensive as to violate Justice Kennedy's standard, although Unity offers a close case." Id.14 Even though we concluded that the time frame was not unreasonably long, we were nonetheless aware of the considerable financial burden that can result from an assignment of liability under the Act.15

Finally, we addressed the proportionality issue and found sufficient proportionality to sustain the constitutionality of the Act.16 That conclusion was, in large part, driven by the underlying conclusion that the burdens imposed under the Act are justified by the industry's past conduct and the reasonable expectations of lifetime benefits it created. We further concluded that the industry's conduct in creating a

_____

13. The Coal Act was passed in 1992 and South Union-WVA, Unity's related person, last signed a NBCWA in 1981.

14. In Unity, we relied on Justice Kennedy's "explication of the relevant due process principles because the plurality did not reach Eastern's due process claim." 178 F.3d at 670 n.13.

15. Eastern Enterprises' estimated liability was between $50 and $100 million. 524 U.S. at 529. Unity alleged that its estimated Coal Act liabilities were over six times its total assets and that if the assignments were upheld, it would be bankrupted. 178 F.3d at 655. At the time Unity's appeal was before us, Unity's total payments were under $1 million. Id. at 671. Significantly, the Companies do not contend that the assignments will force them into bankruptcy. In fact, they have not bothered to supply us with an estimate of their total potential liability.

16. A statute will not violate substantive due process where the burden imposed is "proportional to the harm legitimately addressed by the legislature." Unity, at 671. A statute is not unconstitutional "if the liability actually imposed is not out of proportion to the claimant's prior experience with the object of the legislation." Id. at 672. "Prior experience

can consist of conduct that creates reasonable expectations about the object of the legislation or conduct that creates the problems that impelled the legislature to act." Id.

benefit fund obligated to pay out more monies than the operators were required to provide, and the industry's conduct in creating the problem of underfunding, was exacerbated by coal companies fleeing the coal industry to avoid further contributions to the fund. Id. at 673. Essentially, then, we reasoned that the Act was"Congress' attempt to do equity." Id. at 672. Accordingly, we concluded that the Coal Act did not violate substantive due process. Congress was, after all, entitled to remedy the problems caused by the companies' conduct. Given the importance of the coal industry, Congress could certainly respond to a benefits funding structure "vulnerable to 'dumping' retirees when companies left the industry." Id. at 673. The Coal Act "is targeted to address the problem of insufficient resources in the benefit funds and . . . it puts the burden on those who, in Congress's reasonable judgment, should bear it." Id. at 674.

At oral argument, counsel for the Companies stated that the Companies' "related person" Post-1974 Signatories last signed NBCWAs in 1988. That is only four years from the time the Post-1974 Signatories' contractual obligations to the Funds ceased as the effective date of the Act was 1992. That is significantly less time than the eleven years we found acceptable in Unity.[17] Accordingly, we reject the Companies' proportionality attack on the Commissioner's assignments.[18]

B. Can the Commissioner Make Original Assignments After October 1, 1993?[19]

---

17. We also applied Unity's due process analysis in Anker and found no retroactivity problems in the eight years between the time when Anker's "related person," King Knob, last agreed in a"me too" agreement to be bound by an NBCWA and the passage of the Coal Act. Anker, 177 F.3d at 173.

18. After this case was argued, the Supreme Court decided Barnhart v. Sigmon Coal Co., 534 U.S. 438 (2002). The issue for adjudication in Sigmon was a question of statutory construction centering on whether the Coal Act permits the Commissioner to assign retired miners to successors in interest of out-of-business signatory operators. It has no bearing on the issues presented here.

19. The district court rejected the Companies' argument that certain assignments should be voided because they were made after October 1,

The Companies argue in the alternative that, even if the Commissioner's assignments are constitutional, some of the

assignments are nevertheless invalid because they were made on or after October 1, 1993.[20,21] This argument is grounded upon 26 U.S.C. S 9706(a) which states that the Commissioner "shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business. . . ." (emphasis added). The Companies contend that "shall" means "shall." Accordingly, argue the Companies, since Congress explicitly mandated the Commissioner to make all Coal Act assignments by a date certain, any initial assignments made after that October 1, 1993 are invalid.[22]

The Companies' position is supported by Dixie Fuel Co. v. Commissioner of Social Security, 171 F.3d 1052 (6th Cir. 1999). There, the Court of Appeals for the Sixth Circuit held that the plain language of the statute, the statutory scheme for assigning beneficiaries and the legislative history all demonstrate that "the intent of Congress is clearly expressed in the statute. The October 1, 1993 date is a deadline." Id. at 1064.

_____

1993. The standard of review in cases of statutory construction is plenary. Pfeiffer v. Marion Center Area School District, 917 F.2d 779, 781 (3d Cir. 1990).

20. The Companies' complaint acknowledges that the assignments to Stelco Coal and Shenango were made before October 1, 1993. App. at 29, 31. Therefore, this portion of our analysis does not apply to either of those entities.

21. The Supreme Court has granted certiorari in two cases on this same issue. Peabody Coal Co. v. Massanari, ___ F.3d ___, 2001 WL 857197 (6th Cir. 2001), cert. granted by Barnhart v. Peabody Coal Co., ___ U.S. ___, 122 S.Ct. 918 (2002)( No. 01-705), and Bellaire Corp. v. Massanari, ___ F.3d ___, 2001 WL 856962 (6th Cir. 2001), cert. granted by Holland v. Bellaire Corp., ___ U.S. ___, 122 S.Ct. 918 (2002)(No. 01-715).

22. The Companies "do not challenge the Commissioner's authority to reassign miners after September 30, 1993, i.e., to take miners who were assigned incorrectly before September 30, 1993, and correctly reassign them after September 30, 1993 as provided for in Section 9706(f)(3)." Companies Br. at 23 n.4.

Nevertheless, we disagree. We are persuaded by the analysis of the Court of Appeals for the Fourth Circuit in Holland v. Pardee Coal Co., 269 F.3d 424 (4th Cir. 2001). That is the only other case that has addressed the effect of the October 1, 1993 deadline, and we believe it is better reasoned than Dixie Fuel. In Pardee Coal , the Commissioner determined that Pardee was a signatory operator and assigned it premium liability for a number of retired miners and their spouses. Because several of the retired miners were assigned to Pardee after October 1, 1993, Pardee denied that it was liable to the Combined Fund for those premiums because they were made after the supposed

statutory cut-off date. The district court agreed with Pardee and held that the post-October 1, 1993 assignments were void as a matter of law. However, applying "well-settled principles of statutory construction," the court of appeals examined the text of the Act, the context in which it was enacted, its structure and its legislative history, and found no indication of congressional intent to establish October 1, 1993 as a "jurisdictional deadline, rendering void all beneficiary assignments made by the [Commissioner] after that date." 269 F.3d 437. Our inquiry leads us to the same result.

Admittedly, "shall" is generally mandatory when used in a statute. See, e.g., United States v. Monsanto , 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words [than 'shall order forfeiture'] to express its intent that forfeiture is mandatory. . . ."). However, a statutory deadline does not, by itself, establish that Congress intended to strip an agency's authority to act after the deadline has passed. In Brock v. Pierce County , 476 U.S. 253 (1986), the Court had to decide if Congress intended to prevent the Secretary of Labor from recovering misused funds under the Comprehensive Employment and Training Act ("CETA") after the expiration of a statutory deadline in that Act. The relevant provision of CETA stated that the Secretary "shall" issue a final determination regarding misuse of CETA funds within 120 days after receiving a complaint alleging misuse. Id. at 254-55. The Secretary disallowed Pierce County's expenditure of approximately $500,000 of CETA funds after an investigation disclosed that the funds had not been used appropriately. The county

28

challenged the Secretary's determination in court alleging that the Secretary had no authority because his determination had been made after the 120 day period had expired.

A unanimous Supreme Court disagreed. The Court held that "the mere use of the word 'shall' . . ., standing alone, is not enough to remove the Secretary's power to act after 120 days." Id. at 262. The Court was"most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake." Id. at 260. Rather, the Court concluded that "the normal indicia of congressional intent" should be used to determine whether an agency has authority to act despite the expiration of a statutory deadline. Therefore, we can not satisfactorily resolve that question by focusing upon a single word in a statute, even when that word appears to be as conclusive of congressional intent as "shall" appears to be. Id. at 262 n.9.

We find the Court's reasoning in United States v. James Daniel Good Real Property, 510 U.S. 43 (1993), dispositive here. There, the Court addressed, inter alia, the issue of whether a civil forfeiture action, filed within the statute of

limitations, but without complying with other statutory timing directives, must be dismissed. In finding that the timing did not compel dismissal so long as the action was filed within the statute of limitations, the Court noted that "many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them . . . do not limit their power or render its exercise in disregard of the requisitions ineffectual." Id. at 63 (quoting French v. Edwards, 80 U. S. (13 Wall.) 506, 511 (1872)). Consequently, "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." 510 U. S. at 63 (citations omitted) (emphasis added). No such consequence is included in the Coal Act.

Moreover, we addressed this issue of statutory interpretation in Southwestern Pennsylvania Growth Alliance v. Browner, 121 F.3d 106, 113-115 (3d Cir. 1997).

We were there concerned with whether the Environmental Protection Agency's failure to act on a Clean Air petition within the statutory time frame deprived the agency of authority to take action on the petition. Relying heavily on Brock v. Pierce County, we held that a statute stating that an agency "shall" complete action by a certain time does not divest the agency of jurisdiction to act unless there is some additional indication in the statute of a congressional intent to bar further agency action.

Our review of the Coal Act discloses no further indication of congressional intent to deprive the Commissioner of the authority to make original assignments after October 1, 1993. Congress' failure to specify any consequences if the Secretary does not make assignments by the purported drop dead date is quite telling.23 Moreover, Brock v. Pierce County was decided six years before Congress passed the Coal Act. Accordingly, we must presume that Congress knew that its instruction that the Commissioner"shall" make assignments before October 1, 1993, would not by itself divest the Commissioner of jurisdiction to act after that date. See United States v. Wells, 519 U.S. 482, 485 (1997) ("[W]e presume that Congress expects its statutes to be read in conformity with this Court's precedents[.]"). Congress would have specified consequences for failing to assign by a drop dead date or explicitly stated that the Secretary's authority to assign terminated after that date if Congress had intended to abruptly end the Secretary's authority to make original assignments after October 1, 1993.

Congress has been this explicit in a number of other statutes. See, e.g., 42 U.S.C. S 1396n(h) (application for waiver of Medicaid requirements must be deemed approved if Secretary of Health and Human Services does not issue a decision within 90 days); 49 U.S.C. S 15910(c) (providing that Surface Transportation Board investigative proceeding

is dismissed automatically if not concluded within three years).

_____

23. See In re TWA, 96 F.3d 687, 690 (3d Cir. 1996), referring to a statutory time bar in the Bankruptcy Code as a "drop dead date."

The Companies argue that the Act does provide a consequence for not assigning a miner before October 1, 1993 because after that date the miner becomes an "unassigned miner" and is placed in the orphan retiree pool. However, that is not enough to conclude that the Secretary no longer has authority to assign after October 1, 1993. It is simply a safety net insuring that miners who are not assigned will not thereby be denied the benefits they are entitled to. We see no language in the Act, and the Companies direct us to none, that would forge a link between unassigned status and the Commissioner's failure to complete the assignment process by October 1, 1993.

In addition, the Act's administrative review provisions suggest that Congress did not intend to limit the Commissioner's authority to make assignments after October 1, 1993. The Coal Act gives coal companies the right to an administrative review of an assignment decision and further provides that if the Commissioner concludes that an initial decision was erroneous, the Commissioner must review the beneficiary's record and reassign the miner accordingly. 26 U.S.C. S 9706(f)(3). Although a coal operator's request for a review must be submitted to the Commissioner within a specified time frame, the Act does not impose any time limitations on the Commissioner's review process.[24] This strongly suggests that Congress expected that beneficiary reassignments would be made after October 1, 1993. However, if October 1, 1993 is the drop dead date the Companies claim, the Commissioner would have no authority to make a new assignment even though the initial assignment resulted from factual error, a misreading of the statute, or administrative misfeasance. Although it can be argued that the October 1, 1993 cutoff only applies to original assignments, not those made as a result of the administrative review process, nothing in the text of the Act allows us to draw such a distinction.

_____

24. An assigned operator may, within 30 days of receiving notice with respect to a particular beneficiary, request information as to his work history. See 26 U.S.C. S 9706(f)(1). After receiving the information, the assigned operator has an additional 30 days in which to request review of the assignment. See 26 U.S.C. S 9706(f)(2).

In addition, we can infer no congressional intent to bar agency action after October 1, 1993, from the purpose and structure of the Coal Act. As we noted earlier, the Coal Act

was enacted in 1992 "to ensure that retired coal miners and their dependents would continue to receive the health and death benefits they had been receiving since the 1940s pursuant to a series of collective bargaining agreements." Anker, at 163-64. The Act was bottomed on Congress' explicit finding that

> in order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

26 U.S.C. S 9701 note (emphasis added). Congress was attempting to "insure that every reasonable effort is made to locate a responsible party to provide the benefits before the costs are passed to other signatory companies which have never had any connection to the individual[.]" 138 Cong. Rec. S17604 (daily ed. Oct. 8, 1992). Thus, the Conference Committee Report declared that the Act's "overriding purpose is to find and designate a specific obligor for as many beneficiaries in the [Benefit] Plans as possible." Id. The conferees further stated their "inten[tion] that the largest possible number of beneficiaries in the [Benefit] Plans be assigned to a specific or designated company[,]" and "that the number of unassigned beneficiaries is kept to an absolute minimum." Id. at S17605.

In short, the Coal Act's key objective is to ensure that the costs of providing retirement benefits will, so far as possible, be borne by the private parties most responsible for creating retired miners' expectations of lifetime health benefits. Consequently, the Act broadly imposes liability on original signatories and a broad class of related business entities. Cutting off the Commissioner's authority to make assignments after October 1, 1993, would surely frustrate that objective. If the Commissioner cannot make assignments beyond that date, otherwise assignable beneficiaries would be retained in the orphan retiree pool

32

and benefits would paid from federal funds. 30 U.S.C. S 1232(h) and 26 U.S.C. S 9705(b). Moreover, if those transfers are inadequate, orphan retiree costs will be imposed on other private parties through the imposition of the unassigned beneficiary premium. See 26 U.S.C. S 9704(d).25 Those other private parties would have no substantive connection or nexus to the unassigned beneficiary, and would certainly not be responsible for creating any expectation of lifetime benefits.

Thus, reading "shall" to invalidate post-October 1, 1993 assignments would eviscerate a program intended to impose funding burdens on the most responsible parties and shift funding burdens to the government or to other companies with no connection to the beneficiaries assigned

to those companies. We are thus reminded of the situation in Brock v. Pierce County, where the Court was reluctant to find that a statutory deadline barred agency action because "public rights [were] at stake" and the"public fisc" was implicated. 476 U.S. at 260, 262. Such a result here would also result in a financial windfall to some operators at the expense of those operators whose assignments were completed before October 1, 1993 because the former would be relieved of paying for miners' expectations that they or their related entities helped create.

Finally, putting aside the intricacies of statutory interpretation and legislative history, we reach the same result by employing that all too often overlooked tool: practical common sense. Interpreting the October 1, 1993 date as a cutoff results in a time frame that would make the action Congress required of the Commissioner impossible. It would thereby frustrate the very congressional purpose the Act sought to further. The Coal Act became law in October of 1992. The Commissioner therefore had to review the records of, and assign premium responsibility for, roughly 65,000 miners by October 1, 1993. Holland v. Pardee Coal Co., 269 F.3d at 432 n.9. "To

_____

25. The government submits that these costs could amount to millions of dollars in additional liability. According to the government, nearly 10,000 beneficiary assignments were made after October 1, 1993. Government's Br. at 48.

33

assign those miners, the agency had to search each miner's records, and reconstruct his employment history, and then match that history against the lists of signatory coal operators." Id. This Gordian knot was significantly tightened by Congress' failure to appropriate funds until July 2, 1993 -- less than 80 days before the statutory date of October 1, 1993. It would therefore have been as close to impossible as any administrative task can get for the Commissioner to complete the 65,000 by October 1, 1993. Accordingly, we cannot agree that the Commissioner was powerless to make original assignments after October 1, 1993.26 Thus, as the Court stated in Regions Hosp. v. Shalala, 522 U.S. 448, 459 n.3 (1998), "The Secretary's failure to meet the deadline, a not uncommon occurrence when heavy loads are thrust on administrators, does not mean that the official lacked power to act beyond it."

_____

26. The House Committee on Ways and Means, in a Committee Print issued on September 3, 1993, only four weeks before the effective date of the Coal Act reinforces this point. The Committee Print reads:

    SSA anticipated that checking the [employment] records would be very-time consuming. Most beneficiaries are associated with the 1950 Benefit Fund, and therefore with miners who retired before 1976. Social Security records are not computerized for work history prior to 1978. Linking an individual's work history to a specific

employer will thus require searching through microfilm records and entering the information by hand into the computer system. Preliminary estimates by the SSA suggest that it would take approximately 150 work years just to retrieve the microfilm records. This does not include the additional work involved in determining the assignment to an employer. On a routine basis, SSA has 140 technicians specially trained to work with the microfilm records, which are difficult to decipher. Extra resources would be needed to complete the assignments by the October 1, 1993 target date.

Financing UMWA Coal Miner "Orphan Retiree" Health Benefits, House Committee of Ways and Means (Sept. 3, 1993), at 64-65 (emphasis added). However, Congress did not appropriate any "extra resources" to the Commissioner between September 3, 1993 and October 1, 1993. Therefore, Congress could not possibly have intended that the Commissioner would complete the entire assignment process by October 1, 1993.

34

VI.

Accordingly, for all of the above reasons, we will affirm the judgment of the district court.27

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

_____

27. Because we have found that the Coal Act is constitutional as applied to the Companies, we need not address the Companies' argument that the Commissioner's refusal to revoke their assignments in the wake of Eastern Enterprises was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. S 705(2)(A). In addition, because we have found that the Commissioner has the authority to make original assignments after October 1, 1993, we need not address the Companies' argument that they are entitled to a refund of premiums they are paid.

35